MUNGER, TOLLES & OLSON LLP

355 SOUTH GRAND AVENUE

THIRTY-FIFTH FLOOR

LOS ANGELES, CALIFORNIA 90071-1560

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

———

560 MISSION STREET

SAN FRANCISCO, CALIFORNIA 94105-2907

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

January 12, 2007

WRITER'S DIRECT LINE
(213) 683-9100
Aaron.May@mto.com

Rachlin Cohen & Holtz, LLP
Accounting
Attn:  Custodian of Records
Tenth Floor, One SE Third Avenue
Miami, Florida  33131

Re:    *Gainor v. Sidley Austin*

Dear Sir or Madam:

Attached is a subpoena.  Although we have included proposed dates and locations for the document production, I would be happy to speak with a representative of your company about mutually convenient alternatives.  I would also be happy to speak with a representative of your company about whether modifications to the subpoena would be appropriate in light of the particular types of documents maintained by your company.  Of course, we should speak on that issue soon and I look forward to your communication with me.

Please direct any communications regarding this matter to me at (213) 683-9523, or to my colleague, Eric Kananen at (213) 683-9508.

Sincerely,

Aaron May

AM:ij

cc: Katherine Ezell, Esq.

1227689.1

**EXHIBIT "A"**

## MUNGER, TOLLES & OLSON LLP

355 SOUTH GRAND AVENUE
THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

———

560 MISSION STREET
SAN FRANCISCO, CALIFORNIA 94105-2907
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

January 12, 2007

WRITER'S DIRECT LINE
(213) 683-9100
Aaron.May@mto.com

Richard Wilkes, Esq.
600 South Magnolia Avenue
Suite 200
Tampa, Florida 33606

> Re:    *Gainor v. Sidley Austin*

Dear Richard:

      In connection with the above-referenced matter, I enclose a Subpoena to Rachlin Cohen & Holtz LLP.

      Please direct any communications regarding this matter to me at (213) 683-9523, or to my colleague, Eric Kananen at (213) 683-9508.

                  Sincerely,

                  Aaron May

AM:ij

cc:  Katherine Ezell, Esq.

1227689.1

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Mark J. Gainor,

Plaintiff

V.

Sidley Austin Brown & Wood, LLP

Defendant.

TO: Rachlin Cohen & Holtz LLP

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 06-21748-CIV-MARTINEZ

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See Attachment A.

| PLACE: Katherine W. Ezell, Podhurst Orseck, P.A., City National Bank Bldg., 25 West Flagler Street, Suite 800, Miami, Florida 33130 | DATE AND TIME February 2, 2007 10:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE January 11, 2007 |
|---|---|
| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER | |

Aaron M. May, Munger, Tolles & Olson LLP, 355 S. Grand Avenue, Suite 3500, Los Angeles, CA 90071, 213-683-9100.

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page) If action is pending in district other than district of issuance, state district under case number.

1236375.1

American LegalNet, Inc.
www.FormsWorkflow.com

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |

| | |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(C) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(D) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

American LegalNet, Inc.
www.FormsWorkflow.com

# ATTACHMENT A

# ATTACHMENT A

## DEFINITIONS

1.      As used herein, the terms "Rachlin," "YOU," and "YOUR" mean Rachlin Cohen

& Holtz LLP, including any predecessor or successor entities, and any or all of its present or

former partners, employees, agents, attorneys, investigators, accountants, or representatives.

2.      As used herein, the term "MARK J. GAINOR" means Mark J. Gainor and any

present or former employees, agents, attorneys, investigators, accountants, representatives or

other person or entity acting or purporting to act on his behalf or for his benefit, including, but

not limited to, Gainor Family Trusts; Bryan Holdings, LLC; Bryan Medical, Inc.; Bryan

Ventures, Inc.; Gainor Medical USA, Inc.; Gainor Medical Management, LLC; Logos

Corporation; LSI Holdings, LLC; Lucor Partners, Ltd.; Lucor Special Investments; MJG

Partners, LP; MJG Ventures LLC; Palladium Financial Trust; TransStar, and any predecessor,

successor, or affiliate entities, and any employees, agents, attorneys, directors, officers,

investigators, accountants, representatives, or other persons acting on their behalf.

3.      As used herein, the term "IRS" means the Internal Revenue Service and its

employees, agents, attorneys, investigators, accountants, or representatives.

4.      As used herein, the term "COMPLAINT" means the Complaint filed by Plaintiff

Mark J. Gainor on or about June 2, 2006 in the Circuit Court of the Eleventh Judicial Circuit in

and for Miami-Dade County, Florida Civil Division, which has been removed to and is now

pending in the United States District Court for the Southern District of Florida.  The

COMPLAINT is attached to these requests as Exhibit 1.

5.      As used herein, the term "THE TRANSACTION" means the  transaction

described in paragraph 24 of the COMPLAINT, which is attached hereto as Exhibit 1, during

1234346.4

which "Mark J. Gainor sold its stock in Bryan Medical for two hundred ninety-seven thousand, one hundred fifteen dollars ($297,115) and reported an approximate forty million dollar ($40,000,000) capital loss from the sale. Likewise, on December 23, 1999, Mark J. Gainor sold all of its stock in LSI for one hundred twenty-five thousand, seven hundred seventy-five dollars ($30,600,000) capital loss from the sale."

6.      As used herein, the term "TAX STRATEGY" means any tax strategy, "tax shelter," or other method of reducing tax liabilities designed to produce more than $5000 in tax savings (other than the mortgage interest deduction).

7.      As used herein, the term "GAINOR-TYPE TAX STRATEGY" shall mean transactions whose financial structure and purported tax effects were substantially similar to the TRANSACTION, as defined in paragraph 10 above.

8.      As used herein, the term "DOCUMENT" or "DOCUMENTS" shall be construed in the broadest possible sense and shall include, without limitation, all written, reported, recorded, or graphic matter, however produced and reproduced, that is now or was at any time in the possession, custody or control of the party or any business entity (including corporation) under its control, including but not limited to the following: e-mail, accounts, analyses, arithmetical computations, articles, audio and video recordings (whether stored on computer disk, diskette, hard drive, electronic storage device, or any other computer medium whatsoever), books, charts, designs, discs, drafts, drawings, drums, electronic presentation files, envelopes, films, financial reports, graphs, letters, logs, magazines, magnetic tapes, manuals, maps, meeting minutes, minutes of all other communications, memoranda, messages (including reports, notes, and memoranda of telephone conversations and conferences), microfilm, newspapers, notes, pamphlets, photographs, pictures, print-outs and other data compilations from which

information can be obtained (translated if necessary into usable forms), punch cards, purchase orders, questionnaires and surveys, records, reports, spreadsheets, stenographic or handwritten notes, studies, surveys, tape or other recordings, telegrams, transcriptions, work papers, word processing files, writings, and reproductions of the foregoing upon which notations and writings have been made which do not appear on the originals. A draft or non-identical copy of a DOCUMENT is a separate DOCUMENT within the meaning of this term. The term "DOCUMENT" or "DOCUMENTS" includes all "writings" and "recordings," these terms having the same meaning as that set forth in Rule 1001 of the Federal Rules of Evidence.

9.    As used herein, the terms "COMMUNICATION" and "COMMUNICATIONS" shall mean any oral, written, or other exchange of words, thoughts, or ideas to another person, whether person-to-person, in a group, in a meeting, by e-mail, letter, memoranda, telephone, telex, telegram, facsimile, or by any other process, electronic or otherwise. All written COMMUNICATIONS shall include, without limitation, printed, typed, handwritten, and other readable DOCUMENTS.

10.    As used herein, the term "CONCERNING" shall mean constitute, comprise, consist of, discuss, embody, evidence, memorialize, mention, pertain to, refer to, reflect, relate to, or be in any other way connected with or involved in the matters set forth in the particular document request.

11.    Use of the singular shall be deemed to include the plural and use of the masculine shall be deemed to include the feminine and the neuter, as appropriate, and vice versa. The terms "and," "or," and "and/or" shall be interpreted liberally, as conjunctive, disjunctive, or both depending on the context, so that the fullest disclosure of information and DOCUMENTS is achieved. Each verb includes all of its tenses. "All" and "any" mean "any and all."

- 3 -

1234346.4

## INSTRUCTIONS

1.     If any DOCUMENT is withheld under the claim of privilege or attorney work

product, a list should be furnished identifying each DOCUMENT and the following

information: date, sender, recipient, persons to whom copies were furnished, job titles of each

of these persons, subject matter of the DOCUMENT, number of pages in the DOCUMENT, the

basis or bases upon which the privilege is claimed, the paragraph of this request to which the

DOCUMENT responds, and whether any matter that is not privileged or attorney work product

is discussed or mentioned in the DOCUMENT.

2.     We request production of electronically stored information be made as follows:

(a) E-mail: in single page TIFF images with related, extracted text and associated

metadata (for example, but not limited to, date, time, to, from, cc, bcc fields, internal path

showing mail "folder" names, and source custodian name) in a Concordance load file format

with Opticon image cross reference file, indicating beginning and ending pages of each message

and each attachment, with attachments identified so as to enable the undersigned issuing

attorneys to electronically identify their parent e-mails and with records for which you request

special treatment (such as confidential records) identified with field flags;

(b) E-files, such as Microsoft word documents, Adobe Acrobat pdf's, Excel or other

spreadsheet files: in single page TIFF images with related, extracted text, with tracked changes,

and associated metadata (for example, but not limited to, date last modified, date created, author,

file type [e.g., .doc or .xls], full file path, and source custodian name) in a Concordance load file

format with Opticon image cross reference file, indicating beginning and ending page of each

document, with records for which you request special treatment (such as confidential records)

- 4 -

1234346.4

identified with field flags, and, for Excel and spreadsheet files, so long as the image to be produced communicates all essential substance of the spreadsheet workbooks, including but not limited to essential formulas and hidden data, and if such information is not available in the TIFF image, we request native production of Excel and spreadsheet files; and

(c) <u>Databases</u>: native format or exported to a standard output file type which preserves data content and is readable by other common applications (e.g., Access or SQL).

Notwithstanding the foregoing, if any electronically stored information is produced in a form that is not reasonably useable by the undersigned, the undersigned reserves the right to request that such electronically stored information be delivered in different form so that it is reasonably useable, including, but not limited to, native form.  If you find any part of this FRCP 45 (a)(1) specification unclear, or if you contend it is burdensome, we ask that you communicate with the undersigned at your earliest possible convenience to discuss the forms and volume of electronically stored information to be collected and produced."

3.	If any DOCUMENT requested was but is no longer in your possession or subject to your control, or is no longer in existence, please state whether it (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others and state the identity of those persons to whom it has been transferred; or (d) has been otherwise disposed of, and in each instance, explain the circumstances surrounding each disposition, state the date or approximate date thereof and the identity of the persons with knowledge of such circumstances.

4.	If any DOCUMENT or any portion thereof responsive to any request has been discarded, destroyed, or redacted in whole or in part, state:  (a) the date of the discard, destruction, or redaction; (b) the reason for the discard, destruction, or redaction; (c) the person who discarded, destroyed, or redacted the document; and (d) if discarded or completely

destroyed, the files where the document was maintained prior to its destruction.

     5.      The time period, unless otherwise specified, covered by each request set forth

below is from **January 1, 1996** up to the present.

     6.      The DOCUMENTS described herein for production are to be produced as they

are kept in the usual course of business or shall be organized and labeled to correspond with the

REQUESTS below.

     7.      These REQUESTS are continuing in nature and require the subsequent

production of any documents that are discovered later or whose relevance to this action is

ascertained later in accordance with YOUR discovery obligations under the Federal Rules of

Civil Procedure.


## DOCUMENTS TO BE PRODUCED

### REQUEST FOR PRODUCTION NO. 1:

      All DOCUMENTS CONCERNING THE TRANSACTION.

### REQUEST FOR PRODUCTION NO. 2:

      All COMMUNICATIONS CONCERNING THE TRANSACTION with any

entity other than MARK J. GAINOR.

### REQUEST FOR PRODUCTION NO. 3:

      All COMMUNICATIONS CONCERNING THE TRANSACTION on which

MARK J. GAINOR was copied.

### REQUEST FOR PRODUCTION NO. 4:

      All COMMUNICATIONS CONCERNING THE TRANSACTION with MARK

J. GAINOR.

1234346.4

**REQUEST FOR PRODUCTION NO. 5:**

All DOCUMENTS CONCERNING any interviews of MARK J. GAINOR conducted by the IRS and/or at which the IRS was present.

**REQUEST FOR PRODUCTION NO. 6**

All DOCUMENTS CONCERNING any TAX STRATEGY that MARK J. GAINOR ever considered, reviewed, utilized, or engaged in.

**REQUEST FOR PRODUCTION NO. 7:**

All DOCUMENTS CONCERNING any purported agreement between BROWN & WOOD and ANDERSEN to work together to develop, organize, and/or promote the GAINOR-TYPE TAX STRATEGY.

**REQUEST FOR PRODUCTION NO. 8:**

All DOCUMENTS CONCERNING the effect of IRS Notice 99-59 on the TRANSACTION and/or the GAINOR-TYPE TAX STRATEGY.

**REQUEST FOR PRODUCTION NO. 9**

All DOCUMENTS CONCERNING other tax planning opportunities presented to or considered by MARK J. GAINOR besides THE TRANSACTION between 1997 and 2001.

**REQUEST FOR PRODUCTION NO. 10:**

MARK J. GAINOR's filed state and federal tax returns from 1995 to 2000, including any returns filed jointly with any other person or entity.

**REQUEST FOR PRODUCTION NO. 11:**

All bills and/or invoices transmitted by YOU to MARK J GAINOR CONCERNING THE TRANSACTION.

**REQUEST FOR PRODUCTION NO. 12:**

All DOCUMENTS CONCERNING any settlement or agreement MARK J. GAINOR entered into with the IRS related to THE TRANSACTION.

1234346.4

**REQUEST FOR PRODUCTION NO. 13:**

All COMMUNICATIONS between YOU and any entity other than MARK J. GAINOR CONCERNING the risk of an audit (by any taxing authority) created by MARK J. GAINOR's participation in THE TRANSACTION.

**REQUEST FOR PRODUCTION NO. 14:**

All COMMUNICATIONS between YOU and MARK J. GAINOR CONCERNING an audit of any of MARK J. GAINOR's income tax returns for the tax years 1999 and 2000.

**REQUEST FOR PRODUCTION NO. 15:**

All DOCUMENTS CONCERNING any challenge to, or audit of MARK J. GAINOR's tax returns by any taxing authority, including the Internal Revenue Service.

**REQUEST FOR PRODUCTION NO. 16:**

All DOCUMENTS CONCERNING the GAINOR-TYPE TAX STRATEGY that do not refer to individual clients.

**REQUEST FOR PRODUCTION NO. 17:**

All DOCUMENTS CONCERNING MARK J. GAINOR'S sale of his interests in Gainor Medical management, LLC.

1234346.4

# EXHIBIT 1

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA
CIVIL DIVISION

MARK J. GAINOR,

        Plaintiff,                             CASE NO.:

v.

SIDLEY, AUSTIN, BROWN & WOOD, LLP,

        Defendant.

_____/

## PLAINTIFF'S COMPLAINT
## AND DEMAND FOR JURY TRIAL

      Plaintiff, Mark J. Gainor ("Gainor"), an individual, sues Defendant, Sidley, Austin, Brown &

Wood, LLP ("Sidley"), a Delaware limited liability partnership, and alleges:

## ALLEGATIONS COMMON TO ALL COUNTS
### (Paragraphs 1 - 33)

     1.     This is an action for damages in excess of $15,000.00, exclusive of interest, attorneys'

fees and costs.

     2.     Gainor is an individual residing in Dade County, Florida.

     3.     Sidley is a limited liability partnership organized and existing under the laws of the

State of Delaware with its principal place of business in Chicago, Illinois.

     4.     Sidley is one of the nation's largest law firms, with over 1,400 lawyers, multiple

offices and a practice both national and international in scope.  At all times material, Sidley held

itself out to the public as possessing greater than ordinary knowledge and skill in the field of tax

planning.

5.    Sidley has provided legal services to Florida residents and has furnished legal opinion letters to the Plaintiff, and others, in the State of Florida.

6.    This action accrued in Miami-Dade County, Florida.

7.    Jurisdiction over Sidley is based on § 48.193, Fla. Stat. because these causes of action arise from Sidley individually and/or through its agent(s) doing one or more of the following acts:

   a.    engaging in business in the State of Florida by delivering legal opinion letters in Florida and in providing legal representation to Florida residents;

   b.    committing a tortious act or acts within the State of Florida as alleged in Counts I, V, VI, VII and VIII of this Complaint; and

   c.    causing injury to persons or property within the State of Florida arising out of an act or omission outside of Florida, as alleged in all Counts of this Complaint, and actively engaging in the solicitation of Florida residents for the provision of legal services.

8.    In 1998, Gainor maintained an 81.2% interest in Gainor Medical Management, LLC ("GMM") through direct ownership as well as through interests in two wholly-owned subchapter S corporations, Bryan Medical, Inc. ("Bryan Medical") and Gainor Medical U.S.A., Inc. ("GMUSA").

9.    Arthur Andersen, LLP ("Andersen") had an established relationship of trust and confidence with Gainor as his accountant, consultant, and financial advisor. Due to this relationship, Andersen became aware of Gainor's plans to sell the GMM business.

10.    Before the closing on the sale of his business, Andersen informed Gainor that it might be able to recommend a certain strategy to help reduce his total tax liability on the planned sale.

2

Case 1:06-cv-21748-JEM Document 34-2 Entered on FLSD Docket 02/09/2007 Page 17 of 36

11.     In January of 1999, GMM sold substantially all of its assets and subsidiaries; the liquidation generated a total gain in excess of one hundred and twenty million dollars ($120,000,000).

12.     After the sale, in or about March of 1999, Andersen, with Sidley's express or implicit authority, offered to Gainor a strategy designed by Sidley to effectuate a tax savings of approximately seventeen million dollars ($17,000,000) related to the asset sale. Andersen explained to Gainor that this tax shelter would be supported by a "more likely than not" opinion letter, upon which he could rely, indicating that the deductions arising from the implementation of the strategy (hereinafter the "Sidley Plan") would be upheld, if challenged by the Internal Revenue Service (the "IRS").

13.     On or about August 20, 1999, Andersen sent to Gainor, via facsimile, a schedule confirming the anticipated professional fees and transaction costs that would be incurred and the tax savings to be realized from implementing the Sidley Plan.

14.     The total projected cost of the Sidley Plan included approximately two million, one hundred thousand dollars ($2,100,000) in fees and transaction costs, of which four hundred thousand dollars ($400,000) was allocated to Sidley.

15.     On or about September 1, 1999, Gainor authorized Andersen to proceed with the Sidley Plan.

16.     Unbeknownst to Gainor, beginning in or about January of 1996, Sidley had begun implementing a plan to develop, organize, and sell unregistered abusive tax shelters under the guise of legitimate, complex investment strategies.

17.     Beginning in or about January of 1996 and continuing until at least October 15, 2003, Sidley was organizing and promoting unregistered, abusive tax shelters, including, but not limited to, transactions described by the IRS and identified as "listed transactions" in Notice 99-59 (Boss), Notice 2000-44 (Son-of-Boss, BLIPS, COBRA), Notice 2001-16 (MIDCO), Notice 2001-45 (basis-shifting shelter, FLIPS/OPIS), and Notice 2002-21 (CARDS), as well as certain other transactions identified as Spread Options, Common Trust Fund, and Option Transfer; these shelters were organized, sold, and implemented in conjunction with various accounting firms and investment advisors.

18.     These abusive tax shelters created the appearance of substantial capital losses via a series of transactions specifically designed to offset large capital gains, usually incurred as a result of the taxpayer's liquidation or sale of an investment position or business.

19.     Unbeknownst and undisclosed to Gainor, at some point in time prior to August of 1999, Sidley and Andersen agreed to work together to develop, organize and promote certain abusive tax shelters, including but not limited to the investment strategy recommended to Gainor. Andersen's role included identifying and targeting prospective customers.

20.     Under this arrangement, Sidley authorized and encouraged Andersen to promise to the prospective customers that Andersen would arrange for the customers to get legal representation from Sidley that would in turn provide to them favorable, "independant," more-likely-than-not opinion letters. Andersen's ability to promise the delivery of these opinion letters from Sidley was a significant element in the promotion efforts. In fact, Andersen expressly conditioned its own entitlement to professional fees, upon the delivery of these "more-likely-than-not" opinion letters from independent counsel.

4

21.    After Gainor accepted the Sidley Plan, a series of complex and costly financial transactions were conducted that were designed by Sidley to generate over seventy million dollars ($70,000,000) in apparent capital losses; all of Gainor's ownership interests in GMUSA (by that time having been merged into Lucor Special Investments, Inc. ("LSI")) and Bryan Medical were transferred to MJG (a Georgia limited partnership in which Gainor held an 86.17 percent interest as a limited partner).

22.    On December 10, 1999, the IRS released Notice 99-59, "Tax Avoidance Using Distributions of Encumbered Property."  Notice 99-59 described certain abusive arrangements factually similar to the Sidley Plan and warned that such transactions generate artificial losses lacking economic substance and do not constitute the type of bona fide losses that are deductible under the Internal Revenue Code.

23.    That same day, Sidley and Andersen discussed the impact of Notice 99-59 on the Sidley Plan.  Sidley advised Andersen that Sidley would still issue the favorable "more likely than not" opinion letters, but that the opinions would have to address Notice 99-59.  Sidley admitted to Andersen that Notice 99-59 could impair Gainor's ability to say that he relied in good faith on the advice of a tax professional, but Sidley never communicated this to Gainor.

24.    Thereafter, in accordance with the Sidley Plan, on December 14, 1999, MJG sold its stock in Bryan Medical for two hundred ninety-seven thousand, one hundred fifteen dollars ($297,115) and reported an approximate forty million dollar ($40,000,000) capital loss from the sale. Likewise, on December 23, 1999, MJG sold all of its stock in LSI for one hundred twenty-five thousand, seven hundred seventy-five dollars ($125,775) and reported an additional thirty million, six hundred thousand dollars ($30,600,000) capital loss from the sale.

5

25. After the transactions were finalized, on December 31, 1999, as promised, Sidley delivered to Gainor two qualified tax opinion letters. These letters (over 50 pages in length each) confirmed that the deductions claimed for the capital losses generated in connection with the subject transactions would "more likely than not" be upheld if challenged by the IRS.

26. These opinion letters specifically represent that the subject transactions and consequent deductions claimed would "more likely than not" be upheld if challenged by the IRS. Sidley, via both its pre-transaction representations and finalized opinion letters, represented to Gainor that there was a greater than fifty percent (50%) chance that these losses could legitimately be claimed as deductions and would be upheld if challenged by the IRS. The opinion letters failed to disclose that Notice 99-59 would impair Gainor's ability to say that he relied in good faith upon the advice of a tax professional.

27. At all times material, Sidley knew or should have known that the deductions were not likely to be upheld if challenged by the IRS; this information was withheld from Gainor. Indeed, Sidley knew or should have known that there was virtually no reasonable possibility that the deductions would be upheld if challenged; this information was also withheld from Gainor.

28. More specifically, Sidley knew, or through the exercise of reasonable care and due diligence, should have known, that it was making one or more of the following material misrepresentations or omissions in both its opinion letters of December 31, 1999 and in its preliminary advice and directives:

   a.   misrepresentations as to the actual risk associated with entering into the subject transactions;

6

b.      failure to disclose that the subject transactions should have been registered as "potentially abusive tax shelters" under 26 U.S.C. § 6111(c) and that investor lists needed to be maintained under 26 U.S.C. § 6112;

c.      failure to disclose Sidley's actual role as an organizer, promoter and seller of these unregistered, potentially abusive tax shelters, its relationship with Andersen and other large accounting firms, and related conflicts of interest which precluded the rendition of objective and "independent" tax opinions; and

d.      failing to disclose Sidley's concerns that Gainor's ability to rely in good faith upon the advice of a tax professional was impaired by Notice 99-59.

29.      On December 22, 2001, the IRS published Announcement 2002-2, 2002-1 C.B. 304 (Disclosure Initiative), in which it encouraged taxpayers to disclose their participation in and tax treatment of tax shelters in exchange for the IRS's waiver of certain penalties under 26 U.S.C. § 6662.

30.      On March 14, 2002, Sidley sent three letters to Gainor and related entities advising them of the IRS voluntary disclosure program and "strongly recommending" the he consult with his "regular tax advisor" regarding the terms and implications of the voluntary disclosure program and the advisability of participating in same with respect to the transactions conducted in accordance with the Sidley Plan.

31.      Further to Sidley's correspondence to him of March 14, 2002, Gainor voluntarily disclosed to the IRS his involvement with the subject transactions.

7

32. On January 20, 2006, Gainor filed Form 13750, Election to Participate in Announcement 2005-80 Settlement Initiative. Pursuant to this settlement with the IRS, Gainor accepted disallowance of the claimed tax benefits associated with the Sidley Plan in a manner consistent with relevant published guidance and the facts and circumstances surrounding the transactions. In its examination report, the IRS has proposed to disallow $68,350,964 of capital losses resulting from the transactions, resulting in an approximate underpayment of tax in the amount of $13,670,192.

33. All conditions precedent to the maintenance of this action have been performed, occurred or waived.

## COUNT I
### (Professional Malpractice)

34. Gainor realleges paragraphs 1 through 33 as though fully set forth herein.

35. Gainor and Sidley had an attorney-client relationship.

36. Sidley had a duty to represent Gainor with the reasonable care, skill, and diligence ordinarily possessed and exercised by attorneys specializing in the field of tax planning, under similar circumstances.

37. Sidley breached this duty and deviated from the acceptable standard of care for a tax specialist by its conduct set forth above, including but not limited to the material misrepresentations and/or omissions more specifically set forth in paragraph 28.

38. As a result of Sidley's breaches and deviations, Gainor entered into the subject transactions and has suffered damages including, but not limited to, over two million dollars ($2,000,000) in professional fees and transaction costs incurred in connection with the Sidley Plan,

8

additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, exposure to millions of dollars in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiff, Mark J. Gainor, respectfully requests that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

### COUNT II
### (Breach of Contract)

39.   Gainor realleges paragraphs 1 through 33 as though fully set forth herein.

40.   At all times material, Andersen had actual or apparent authority to act on behalf of Sidley in connection with the implementation of the Sidley Plan.

41.   Sidley, through its agent, Andersen, and Gainor entered into an oral agreement. The terms were that Sidley would represent Gainor and provide certain legal services. More specifically, Sidley, working through Andersen, would advise Gainor on how to structure a complex set of business transactions that would provide substantial tax savings related to the sale of his business. Sidley further agreed to provide "independent," legal opinion letters confirming the propriety of these transactions and opining that the consequent deductions taken would more likely than not be upheld if challenged by the IRS. In consideration thereof, Gainor agreed to pay Sidley four hundred thousand dollars ($400,000).

42.   The foregoing agreement constitutes an oral contract for the provision of legal services and thus, there was an implied covenant by Sidley to exercise ordinary skill and knowledge in the

9

rendition of professional legal services. Additionally there was implied covenant of good faith and fair dealing.

43.    Gainor fully performed his duties under the contract. Although Sidley delivered the legal opinion letters, it breached the contract by breaking both of the implied covenants set forth in paragraph 42 above. Sidley breached these covenants by its conduct set forth above, including, but not limited to, the material misrepresentations and/or omissions more specifically set forth in paragraph 28.

44.    As a result of Sidley's breaches, Gainor entered into the subject transactions and has suffered damages including, but not limited to, over two million dollars ($2,000,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, exposure to millions of dollars in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiff, Mark J. Gainor, respectfully requests that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT III
### (Breach of Contract Implied in Fact)

45.    Gainor realleges paragraphs 1 through 33 as though fully set forth herein.

46.    An agreement between Sidley and Gainor arose by implication given the facts and circumstances surrounding the parties' conduct.

10

47.     Gainor conferred a benefit upon Sidley by paying four hundred thousand dollars ($400,000) to Sidley which was accepted as payment for legal services.

48.     Under ordinary circumstances, a reasonable law firm holding itself out as specializing in tax planning, would reasonably expect to be required to render substantial, competent legal services for such a benefit.

49.     Sidley breached the implied contract with Gainor in failing to render competent legal services by, among other things: (1) failing to exercise such reasonable care, skill, and diligence as is ordinarily exercised by attorneys specializing in the field of tax planning, under similar circumstances; (2) failure to disclose that the subject transactions should have been registered as "potentially abusive tax shelters" under 26 U.S.C. § 6111(c) and that investor lists needed to be maintained under 26 U.S.C. § 6112; (3) failing to disclose Sidley's actual role as an organizer, promoter and seller of these and other unregistered, potentially abusive tax shelters, its relationship with Andersen, and related conflicts of interest which precluded the rendering of objective and "independent" tax opinions; and (4) failing to disclose to Gainor Sidley's concerns that Gainor's ability to rely in good faith upon the advice of a tax professional was impaired by Notice 99-59.

50.     As a result of Sidley's failure to render competent legal advice, Gainor entered into the subject transactions and has suffered damages including, but not limited to, over two million dollars ($2,000,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, exposure to millions of dollars in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiff, Mark J. Gainor, respectfully requests that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT IV
### (Breach of Contract Implied in Law: Unjust Enrichment)

51.     Gainor realleges paragraphs 1 through 33 as though fully set forth herein.

52.     Gainor conferred a benefit upon Sidley by paying four hundred thousand dollars ($400,000) to Sidley.

53.     Sidley knowingly and voluntarily accepted and retained this benefit conferred upon it as compensation for providing competent legal services that were never rendered.

54.     Under these circumstances, Sidley would be unjustly enriched if permitted to retain this benefit without having rendered competent legal services, unless Sidley is required to disgorge these professional fees, together with interest, back to Gainor.

WHEREFORE, Plaintiff, Mark J. Gainor, respectfully requests that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT V
### (Negligent Misrepresentation)

55.     Gainor realleges paragraphs 1 through 33 as though fully set forth herein.

56.     Sidley authorized and encouraged Andersen to utilize Sidley's name and reputation as well as the promise of favorable, "more likely than not," Sidley opinion letters, in order to promote certain abusive tax shelters.

12

57. As set forth above, Sidley, via authorized statements made by Andersen on its behalf, and in statements contained within its final opinion letters delivered to Gainor, made one or more of the false statements or omissions of material fact more specifically set forth in paragraph 28.

58. At the time they were made, Sidley should have known that these representations of material fact were false and that these omissions of fact were material.

59. As a result of their attorney-client relationship, Sidley and Gainor's relationship was both fiduciary and confidential in nature. Furthermore, Sidley held itself out to the public as a tax specialist with a superior knowledge of the subject matter to which these misrepresentations and omissions relate.

60. Sidley intended that its misrepresentations and omissions of material fact induce Gainor to act in reliance thereon.

61. Gainor justifiably relied on Sidley's misrepresentations and omissions of material fact by entering into the subject transactions and paying substantial fees and transaction costs.

62. As a result of Sidley's negligent misrepresentations and omissions, Gainor has suffered damages including, but not limited to, over two million dollars ($2,000,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, exposure to millions of dollars in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiff, Mark J. Gainor, respectfully requests that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

13

## COUNT VI
### (Fraudulent Misrepresentation)

63.    Gainor realleges paragraphs 1 through 33 as though fully set forth herein.

64.    Sidley authorized and encouraged Andersen to utilize the Sidley name and reputation as well as the promise of favorable, "more likely than not," Sidley opinion letters to promote certain abusive tax shelters.

65.    As set forth above, Sidley, via authorized statements made by Andersen on its behalf and in statements contained within its final opinion letters delivered to Gainor, made one or more of the false statements or omissions of material fact more specifically set forth in paragraph 28.

66.    At the time they were made, Sidley knew that these representations of material fact were false and that these omissions of fact were material.

67.    As a result of their attorney-client relationship, Sidley and Gainor's relationship was both fiduciary and confidential in nature. Furthermore, Sidley held itself out to the public as a tax specialist with a superior knowledge of the subject matter to which these misrepresentations and omissions relate.

68.    Sidley intended that its misrepresentations and omissions of material fact induce Gainor to act in reliance thereon.

69.    Gainor justifiably relied on Sidley's misrepresentations and omissions of material fact by entering into the subject transactions and paying substantial fees and transaction costs.

70.    As a result of Sidley's fraudulent misrepresentations and omissions, Gainor has suffered damages including but not limited to over two million dollars ($2,000,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs

14

incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, exposure to millions of dollars in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiff, Mark J. Gainor, respectfully requests that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT VII
### (Breach of Fiduciary Duty)

71.    Gainor realleges paragraphs 1 through 33 as though fully set forth herein.

72.    As a result of their attorney-client relationship, Sidley and Gainor's relationship was fiduciary in nature in that Gainor reposed trust and confidence in Sidley and Sidley undertook such trust, and assumed a fiduciary duty to advise, counsel, and protect Gainor and to exercise loyalty and due care.

73.    Sidley breached its fiduciary duty owed to Gainor by: (1) misrepresenting the risk associated with entering into the subject transactions; (2) failing to disclose that the subject transactions should have been registered as "potentially abusive tax shelters" under 26 U.S.C. § 6111(c) and that investor lists needed to be maintained under 26 U.S.C. § 6112; (3) failing to disclose Sidley's actual role as an organizer, promoter and seller of these and other unregistered, potentially abusive tax shelters, its relationship with Andersen, and related conflicts of interest which precluded the rendering of objective and "independent" tax opinions; and (4) failing to disclose Sidley's concerns regarding Gainor's ability to say in good faith that he relied upon the advice of a tax professional.

15

74.    As a result of Sidley's breach of fiduciary duty, Gainor entered into the subject transactions and has suffered damages including but not limited to over two million dollars ($2,000,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, exposure to millions of dollars in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiff, Mark J. Gainor, respectfully requests that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT VIII
### (Tortious Interference with an Advantageous Business Relationship)

75.    Gainor realleges paragraphs 1 through 33 as though fully set forth herein.

76.    Gainor had an established business relationship of trust and confidence with Andersen. Gainor routinely relied on Andersen to provide accounting and consulting services and to protect his financial interests while maintaining the confidentiality of sensitive financial information.

77.    Sidley had knowledge that Andersen maintained these types of relationships with clients such as Gainor and had access to such clients' confidential financial information. Sidley knew that Andersen's existing relationships with clients such as Gainor could be utilized to promote unregistered, abusive tax shelters being sold and marketed by Sidley for profit.

78.    Sidley intentionally and unjustifiably interfered with Gainor's advantageous business, confidential and fiduciary relationship with Andersen by inducing Andersen to promote the Sidley Plan to Andersen's clients, including Gainor.

16

79.   As a result of Sidley's interference, Gainor entered into the subject transactions and has suffered damages including but not limited to over two million dollars ($2,000,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, exposure to millions of dollars in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiff, Mark J. Gainor, respectfully requests that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT IX
### (Violations of the Florida Civil Remedies for Criminal Practices Act)

80.   Gainor realleges paragraphs 1 through 33 as though fully set forth herein.

81.   Beginning in or about January of 1996 and continuing until at least October 15, 2003, Sidley knowingly and willfully engaged in a scheme to defraud hundreds of individuals across the United States by directly or indirectly organizing and promoting unregistered, abusive tax shelters, under the guise of legitimate investment strategies, including but not limited to transactions described by the IRS and identified as "listed transactions" in Notice 99-59 (Boss), Notice 2000-44 (Son-of-Boss, BLIPS, COBRA), Notice 2001-16 (MIDCO), Notice 2001-45 (basis-shifting shelter, FLIPS/OPIS), and Notice 2002-21 (CARDS), as well as certain other transactions identified as Spread Options, Common Trust Fund, and Option Transfer that were organized, sold and implemented in conjunction with various accounting firms and investment advisors.

17

82. These abusive tax shelters created the appearance of substantial capital losses via a series of transactions specifically designed to offset large capital gains, usually incurred as a result of the taxpayer's liquidation or sale of an investment position or business.

83. Sidley generated millions of dollars in professional fees by repeatedly issuing favorable ("more than likely than not") tax opinion letters in connection with these abusive tax shelters.

84. Further to its marketing of these tax shelters, Sidley recruited some of the largest accounting and financial consulting firms, including Andersen and KPMG, LLP ("KPMG"), as well as other financial institutions (hereinafter "The Marketers"), in order to identify and target prospective customers.

85. In order to more effectively promote these abusive tax shelters, Sidley authorized and encouraged The Marketers to promise to the prospective customers that The Marketers would arrange for legal representation from Sidley, which would in turn provide favorable, "independent," more-likely-than-not opinion letters. The Marketers' ability to promise the delivery of these opinion letters from Sidley was a significant element in the promotion efforts.

86. Sidley authorized The Marketers to represent to prospective customers that certain deductions taken as a result of taxpayers implementing these abusive tax shelters would "more likely than not" be upheld if challenged by the IRS. At the time Sidley authorized these representations, it knew that they were false.

87. Over the course of a seven-year period, Sidley systematically issued hundreds of knowingly false and misleading, favorable opinion letters on these tax shelters that it was secretly promoting via The Marketers. These form opinion letters were false and misleading because, at the

18

time they were issued, Sidley knowingly and willfully: (1) misrepresented the risks associated with entering into the tax shelter; (2) failed to disclose that the subject transactions should have been registered as "potentially abusive tax shelters" under 26 U.S.C. § 6111(c) and that investor lists needed to be maintained under 26 U.S.C. § 6112; and (3) failed to disclose Sidley's actual role as an organizer, promoter and seller of these unregistered, potentially abusive tax shelters, its relationship with The Marketers, and related conflicts of interest which precluded the rendition of objective and "independent" tax opinions.

88. Sidley's attorney-client relationships with Gainor and other similarly situated tax shelter customers were both fiduciary and confidential in nature. Furthermore, Sidley held itself out to the public as a tax specialist with superior knowledge of the subject matter as to which these intentional misrepresentations and omissions related.

89. Sidley intended that its misrepresentations and omissions of material fact induce Gainor and other similarly situated clients to act in reliance thereon.

90. Gainor justifiably relied on Sidley's misrepresentations and omissions of material fact by entering into the subject transactions and paying substantial fees and transaction costs.

91. Sidley knowingly and willfully engaged in a systematic course of conduct by promoting abusive tax shelters and repeatedly delivering knowingly false and misleading, form opinion letters to Florida residents with the criminal intent to obtain monies from one or more persons by false or fraudulent pretenses, representations, and/or promises.

92. Sidley's conduct in repeatedly and knowingly promoting abusive tax shelters and delivering false and misleading opinion letters to Florida residents via U.S. mail constitutes a pattern

19

of criminal activity and is unlawful pursuant to Fla. Stat. §§ 817.034 (a) and (b), and/or Title 18 U.S.C. § 1341.

93.     While engaging in this scheme to defraud and in furtherance thereof, Sidley, on multiple occasions, communicated with persons located within the state of Florida, via U.S. mail, with the intent to obtain monies from such persons, including the occasions specifically set forth below:

   a.     On or about June 15, 1998, Sidley delivered to Peter T. Loftin in Florida, via U.S. Mail, one of its knowingly false and misleading, form opinion letters. This letter opined that deductions taken as a result of certain investment transactions, similar in nature to those transactions later described by the IRS and identified as "listed transactions" in Notice 2000-45 (FLIPS), would more likely than not be upheld if challenged by the IRS.

   b.     On or about August 31, 1998, Sidley delivered to Joseph J. Jacoboni in Florida, via U.S. Mail, one of its knowingly false and misleading, form opinion letters. This letter opined that deductions taken as a result of certain investment transactions similar in nature to those transactions later described by the IRS and identified as "listed transactions" in Notice 2000-45 (FLIPS), would more likely than not be upheld if challenged by the IRS.

   c.     On or about December 31, 1999, Sidley delivered to Peter T. Loftin in Florida, via U.S. Mail, one of its knowingly false and misleading, form opinion letters. This letter opined that deductions taken as a result of certain investment transactions similar in nature to those transactions later described by the IRS and

20

identified as "listed transactions" in Notice 2000-44 (BLIPS), would more likely than not be upheld if challenged by the IRS.

d.   On or about December 31, 1999, Sidley delivered to Gainor in Florida, via U.S. Mail, one of its knowingly false and misleading, form opinion letters. This letter opined that deductions taken as a result of certain investment transactions similar in nature to those transactions described by the IRS and identified as "listed transactions" in Notice 99-59 (BOSS), would more likely than not be upheld if challenged by the IRS.

e.   On or about December 31, 1999, Sidley again delivered to Gainor in Florida, via U.S. Mail, another of its knowingly false and misleading, form opinion letters. This letter opined that deductions taken as a result of certain other investment transactions similar in nature to those transactions described by the IRS and identified as "listed transactions" in Notice 99-59 (BOSS), would more likely than not be upheld if challenged by the IRS.

94.   As a result of its criminal actions, Sidley has received substantial payments, including but not limited to, payments for each of the knowingly false and misleading opinion letters referenced in paragraph 93 above.

95.   Sidley has used or invested, directly or indirectly, the proceeds of these payments in the acquisition of title to or a right or equity in real property, or in the establishment or operation of an enterprise.

96.   Sidley's actions are unlawful pursuant to § 772.103, Fla. Stat.

21

97.    As a result of Sidley's actions, Gainor entered into the subject transactions and has suffered damages including but not limited to over two million dollars ($2,000,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, exposure to millions of dollars in additional taxes, and lost opportunities for proper tax planning.

98.    Gainor has been forced to retain the undersigned counsel and is obligated to pay them a reasonable fee for legal services.

WHEREFORE, Plaintiff, Mark J. Gainor, respectfully requests that this Court award treble damages, statutory damages, costs, and attorneys fees pursuant to § 772.104, Fla. Stat., against Sidley and such further relief as this Court deems just and proper in the premises.

## DEMAND FOR JURY TRIAL

Gainor demands a jury trial on all issues so triable.


RICHARD BENJAMIN WILKES
Florida Bar No. 267163
RICHARD BENJAMIN WILKES, P.A.
600 South Magnolia Avenue, Suite 200
Tampa, Florida 33606
Telephone:    (813) 254-6060
Facsimile:    (813) 254-6088
rwilkes@rbwilkes.com
Attorneys for Plaintiff


22