# **EXHIBIT A**

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 06-21748-CIV-MARTINEZ-BANDSTRA

MARK J. GAINOR and ELYSE GAINOR,

      Plaintiffs,

v.

SIDLEY AUSTIN LLP, a Delaware limited liability
Partnership, f/k/a SIDLEY AUSTIN
BROWN & WOOD, f/k/a BROWN & WOOD,
R. J. RUBLE, an individual, ARTHUR
ANDERSEN, LLP, an Illinois limited liability
partnership, MICHAEL S. MARX, an individual,
P. ANTHONY NISSLEY, an individual,
MERRILL LYNCH & CO., INC., a Delaware
corporation, and MARK C. KLOPFENSTEIN,
an individual,

      Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs, Mark J. Gainor ("Gainor") and Elyse Gainor, two individuals, sue

Defendants, Sidley, Austin, Brown & Wood, LLP ("Sidley"), R. J. Ruble, ("Ruble"),

Arthur Andersen ("Andersen"), Michael S. Marx ("Marx"), P. Anthony Nissley

("Nissley"), Merrill Lynch & Co., Inc. ("Merrill Lynch"), and Mark C. Klopfenstein

("Klopfenstein"), and allege:

### THE PARTIES

      1.    Plaintiff Mark Gainor was, at all times material, an individual residing in

the State of Georgia and then later in Dade County, Florida. Plaintiff Elyse Gainor was

at all times material, an individual residing in the State of Georgia and then later in Dade

County, Florida and is, and at all material times was, the wife of Plaintiff Mark Gainor.

Plaintiff Elyse Gainor also suffered the adverse tax consequences set forth below, as she

filed joint tax returns with her husband Plaintiff Mark Gainor.

      2.    Defendant Sidley is a limited liability partnership organized and existing

under the laws of the State of Delaware with its principal place of business in Chicago,

Illinois.

      3.    Sidley is one of the nation's largest and most prominent law firms, with

over 1,400 lawyers, multiple offices in the United States and abroad, and a practice that is

both nationwide and international in scope.

      4.    At all times material, Sidley held itself out to the public as possessing

special knowledge, skill and expertise in the field of tax planning.

      5.    Defendant R. J. Ruble is an individual who is a citizen and resident of the

state of New York.

      6.    At all times material, Ruble was a partner in Defendant Sidley in the tax

planning department.  Ruble also held himself out to the public as possessing special

knowledge, skill and expertise in the field of tax planning.

      7.    At all times material hereto, Defendant Andersen was a worldwide firm of

certified public accountants, auditors and consultants, practicing as a limited liability

partnership organized and existing under the laws of the State of Illinois with its principal

place of business in Chicago, Illinois.

      8.    Defendant Andersen was one of the original "Big Eight" accounting firms.

It had tens of thousands of employees, multiple offices in the United States and abroad,

and a practice both national and international in scope. In 1999, it was truly one of the most respected and trusted accounting firms in the world.

9.      At all times material, Andersen held itself out to the public as possessing special knowledge, skill and expertise in the fields of tax planning and transaction structuring.

10.      Defendant Marx is an individual who is a citizen and resident of the state of Georgia.

11.      At all times material, Marx, who is a Certified Public Accountant, was a partner or employee of Defendant Andersen. Marx also held himself out to the public as possessing special knowledge, skill and expertise in the fields of tax planning and transaction structuring.

12.      Defendant Nissley is an individual who is a citizen and resident of the state of Illinois.

13.      At all times material, Nissley was a partner or employee of Defendant Andersen. Nissley also held himself out to the public as possessing special knowledge, skill and expertise in the fields of tax planning and transaction structuring.

14.      Defendant Merrill Lynch is a corporation organized and existing under the laws of the State of Delaware.

15.      Merrill Lynch is one of the largest financial services firms in the world. It has tens of thousands of employees, multiple offices in the United States and abroad, and a practice both national and international in scope.

16.      At all times material, Merrill Lynch held itself out to the public as possessing special knowledge, skill and expertise in the field of transaction structuring.

3

17.     Defendant Klopfenstein is an individual who is a citizen and resident of the State of Georgia. Klopfenstein is a former employee of Defendant Andersen.

## JURISDICTION AND VENUE

18.     This is an action for damages in excess of two million dollars ($2,000,000.00) exclusive of interest, attorneys' fees and costs.

19.     This action accrued in Miami-Dade County, Florida.

20.     Jurisdiction over Defendants Sidley, Ruble, Andersen, Marx, Nissley and Klopfenstein, is proper under § 48.193, Fla. Stat., because this action arises from one or more of the following acts by each, acting individually, collectively with the other Defendants, and/or through agent(s):

    a.      engaging in business in the State of Florida;

    b.      committing a tortious act or acts within the State of Florida;

    c.      causing injury to persons or property within the State of Florida arising out of an act or omission outside of Florida;

    d.      breaching a contract in the State of Florida;

    e.      actively engaging in the solicitation of Florida residents for the provision of professional services;

    f.      Andersen, through Marx, and Sidley, through Ruble, communicated with Gainor while Gainor was in Florida.

21.     Defendant Merrill Lynch has offices in the State of Florida, does business in the State of Florida, and has qualified to do business in the State of Florida.

## NATURE OF THE ACTION

22.    This case arises from a well-planned conspiracy by Defendants Andersen, Marx, Nissley, Sidley, Ruble, Merrill Lynch and Klopfenstein, in which they misused their substantial reputations and positions of trust to bilk Plaintiff Gainor out of millions of dollars.

23.    The scheme entailed Defendants inducing Plaintiff Gainor to believe that Defendants had a legal "tax strategy" (hereinafter "the Sidley Plan") which would yield Gainor over seventeen million dollars ($17,000,000) in tax savings, and persuading Gainor to pay them over two million one hundred thousand dollars ($2,100,000) in fees to implement the Sidley Plan.

24.    In actuality, as Defendants well knew, the Sidley Plan was a fraudulent tax scheme certain to be condemned by the Internal Revenue Service. The result was that Gainor had to pay an additional seventeen million dollars ($17,000,000) in taxes and interest, and substantial additional amounts in professional fees and costs incurred in negotiations with the Internal Revenue Service.

25.    As more fully set forth below, the Defendants acted in a highly-organized fashion, with each conspirator fulfilling a critical, pre-planned role. Upon information and belief, Plaintiff Gainor is merely one of hundreds of victims of such conspiracies.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

26.    In 1998, Gainor maintained an 81.2% interest in Gainor Medical Management, LLC ("GMM") through direct ownership as well as through interests in two wholly-owned subchapter S corporations, Bryan Medical, Inc. ("Bryan Medical") and Gainor Medical U.S.A., Inc. ("GMUSA").

5

27.    Andersen had an established relationship of trust and confidence with Plaintiff Gainor as his accountant, consultant, and financial advisor.    Due to this relationship, Andersen became aware of Gainor's plans to sell the GMM business.

28.    Before the closing on the sale of the business, Andersen informed Gainor that it might be able to recommend a course of action that would reduce Gainor's total tax liability on the planned sale.

29.    In or about December of 1998, GMM agreed to sell substantially all of its assets and subsidiaries; the liquidation generated a total gain in excess of one hundred thirty million dollars ($130,000,000); the sale closed in about January of 1999.

30.    Unbeknownst to Gainor, Andersen was an established client of Sidley's, and in July of 1999, Sidley opened a new file for Andersen, with Ruble as the partner in charge, for "structuring tax advantage transactions."

31.    On August 5, 1999, Ruble, then a partner in Defendant Sidley, provided Marx and Nissley with a redacted sample opinion letter that he had prepared for another transaction, knowing and intending that Andersen would rely on it and use it to sell a tax shelter proposal to Gainor.

32.    Later in August of 1999, Andersen, with Sidley's express or implicit authority, offered to Gainor a "strategy" designed by Sidley (hereinafter "the Sidley Plan") to effectuate a tax savings of approximately seventeen million dollars ($17,000,000) related to the asset sale.  Andersen, through Marx, explained to Gainor that this tax shelter would be supported by an opinion letter from Sidley, on which Gainor could rely, and that the losses and deductions to be claimed from implementation of the strategy (which would create the tax savings) would likely be upheld if challenged by the

6

Internal Revenue Service (the "IRS"). Andersen also advised Gainor that it had also met with Merrill Lynch personnel at a recent conference in Phoenix and that Merrill Lynch would assist in effectuating the program.

33.    On or about August 20, 1999, Andersen sent to Gainor, via facsimile, a schedule confirming the anticipated professional fees and transaction costs that would be incurred and the tax savings to be realized from implementing the Sidley Plan.

34.    The total projected cost of the Sidley Plan, as reflected in an updated transaction summary from October of 1999, included approximately two million, one hundred thousand dollars ($2,100,000) in fees and transaction costs payable to Defendants Andersen, Sidley and Merrill Lynch, and to an entity controlled by Defendant Klopfenstein.

35.    On or about September 1, 1999, Gainor authorized Andersen to proceed with Defendants' implementation of the Sidley Plan.

36.    After Gainor authorized implementation of the Sidley Plan, a series of complex and costly financial transactions were conducted that were designed by Sidley to generate over seventy million dollars ($70,000,000) in apparent capital losses. All of Gainor's ownership interests in GMUSA (by that time having been merged into Lucor Special Investments, Inc. ("LSI")) and Bryan Medical were transferred to MJG, a Georgia limited partnership in which Gainor held an 86.17 percent interest as a limited partner.

37.    On December 10, 1999, the IRS released Notice 99-59, "Tax Avoidance Using Distributions of Encumbered Property." Notice 99-59 described certain abusive arrangements factually similar to the Sidley Plan and warned that such transactions

7

generate artificial losses lacking economic substance and do not constitute the type of bona fide losses that are deductible under the Internal Revenue Code.

38.    That same day, Sidley and Andersen discussed the impact of Notice 99-59 on the Sidley Plan.  Sidley advised Andersen that Sidley would still issue the favorable "more likely than not" opinion letters, but that the opinions would have to address Notice 99-59.  Sidley admitted to Andersen that Notice 99-59 could impair Gainor's ability to say that he relied in good faith on the advice of a tax professional, but Sidley never communicated this to Gainor.

39.    Thereafter, in accordance with the Sidley Plan, on December 14, 1999, MJG sold its stock in Bryan Medical to one of the Klopfenstein entities for two hundred ninety-seven thousand, one hundred fifteen dollars ($297,115) a forty million dollar ($40,000,000) capital loss on paper.  Likewise, on December 23, 1999, MJG sold all of its stock in LSI to the other Klopfenstein entity for one hundred twenty-five thousand, seven hundred seventy-five dollars ($125,775), an additional thirty million, six hundred thousand dollars ($30,600,000) capital loss on paper.

40.    Sometime after the transactions were finalized, on or after December 31, 1999, Sidley delivered to Gainor two qualified tax opinion letters.  These letters (each over 50 pages in length) confirmed that the deductions claimed for the capital losses generated in connection with the subject transactions would "more likely than not" be upheld if challenged by the IRS.

41.    Subsequently, Andersen prepared the federal income tax returns for the Plaintiffs that reported these transactions. On these returns, Andersen reported a forty million dollar ($40,000,000) capital loss from the Bryan Medical sale, and claimed a

deduction in that amount. Andersen reported an additional thirty million, six hundred thousand dollar ($30,600,000) capital loss from the MJG sale, and claimed a further deduction in that amount. Thus, the total capital losses and deductions claimed from the two transactions exceeded seventy million dollars ($70,000,000). No offsetting gains were reported.

42.    On December 22, 2001, the IRS published Announcement 2002-2, 2002-1 C.B. 304 (Disclosure Initiative), in which it encouraged taxpayers to disclose their participation in and tax treatment of tax shelters in exchange for the IRS's waiver of certain penalties under 26 U.S.C. § 6662.

43.    On March 14, 2002, Sidley sent three letters to Gainor and related entities advising them of the IRS voluntary disclosure program and "strongly recommending" Gainor consult with his "regular tax advisor" regarding the terms and implications of the voluntary disclosure program and the advisability of participating in same with respect to the transactions conducted in accordance with the Sidley Plan.

44.    Prior to Sidley's correspondence to him of March 14, 2002, Gainor voluntarily disclosed to the IRS his involvement with the subject transactions.

45.    Gainor engaged tax counsel and other professionals to handle the dealings with the IRS. Gainor's representative contacted Sidley to inquire if Sidley continued to stand behind its opinion letters and Andersen to see if it would provide assistance. On January 23, 2004, Sidley advised that it continued to maintain that its opinions were correct. Sidley has never subsequently advised Gainor of a change in this position.

46.    As more fully set forth above, Andersen prepared and signed the tax returns that claimed deductions for the losses created by the Sidley Plan, thereby explicitly

demonstrating that Andersen's position was that the claimed losses were legitimately deductible. Accordingly, Andersen was also contacted by Gainor's new representatives. Andersen never advised Gainor of a change in its position that the losses were legitimately deductible.

47.    Klopfenstein was involved in the same IRS dealings as Gainor. Throughout, he maintained the position that the claimed deductions were legitimate. Klopfenstein has never advised Gainor of a change in his position that the losses were legitimately deductible.

48.    Similarly, Merrill Lynch has never advised Gainor of a change in its position that the losses created by the Sidley Plan were legitimately deductible.

49.    Although he incurred substantial legal fees and costs in an effort to find a way to determine any legitimacy to the tax deductions, Gainor could not do so. Accordingly, on January 20, 2006, upon the recommendation and advice of tax counsel, Gainor filed Form 13750, Election to Participate in Announcement 2005-80 Settlement Initiative. Pursuant to this settlement with the IRS, Gainor accepted disallowance of the claimed tax benefits associated with the strategy, in a manner consistent with relevant published guidance and the facts and circumstances surrounding the transactions, and the IRS agreed not to pursue any penalties against Gainor for his participation in the scheme. As a result, $68,350,964 of capital losses which had been claimed based on the Sidley Plan transactions, were disallowed, causing Plaintiff Gainor to have to pay additional taxes and interest in an amount in excess of seventeen million dollars ($17,000,000).

50.    All conditions precedent to the maintenance of this action have occurred.

## COUNT I
### (Conspiracy Against All Defendants)

51.    Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

52.    Unbeknownst to Gainor, beginning in or about January of 1996, Sidley had begun implementing a plan to develop, organize, and sell unregistered abusive tax shelters under the guise of legitimate, complex investment strategies.

53.    Beginning in or about January of 1996 and continuing until at least October 15, 2003, Sidley was organizing and promoting unregistered, abusive tax shelters, including, but not limited to, transactions described by the IRS and identified as "listed transactions" in Notice 99-59 (Boss), Notice 2000-44 (Son-of-Boss, BLIPS, COBRA), Notice 2001-16 (MIDCO), Notice 2001-45 (basis-shifting shelter, FLIPS/OPIS), and Notice 2002-21 (CARDS), as well as certain other transactions identified as Spread Options, Common Trust Fund, and Option Transfer. These shelters were organized, sold, and implemented in conjunction with various accounting firms and investment advisors.

54.    These abusive tax shelters created the appearance of substantial capital losses via a series of transactions specifically designed to offset large capital gains, usually incurred as a result of the taxpayer's liquidation or sale of an investment position or business.

55.    Unbeknownst and undisclosed to Gainor, at some point in time prior to January of 1999, Sidley and Andersen agreed to work together to develop, organize and promote certain abusive tax shelters, including but not limited to the investment strategy recommended to Gainor.  Andersen's role included identifying and targeting prospective customers.

11

56.    Under this arrangement, Sidley authorized and encouraged Andersen to promise to the prospective customers that Andersen would arrange for the customers to receive favorable "independent" legal opinions from Sidley that it was "more-likely-than-not" that the tax losses claimed from the transactions would be upheld as legitimate tax deductions if challenged by the IRS. Andersen's ability to promise delivery of these opinion letters from Sidley was a significant element in the promotion efforts. In fact, Andersen expressly conditioned its own entitlement to professional fees upon the delivery of these "more-likely-than-not" opinion letters from independent counsel.

57.    As more fully set forth above, as a result of its position as Gainor's accountant, Andersen, through Defendant Michael Marx, learned of the planned sale of Gainor's medical services business and the substantial profit Gainor would realize from the sale.

58.    Before the closing on the sale of the business, Andersen, acting through Defendant Marx, informed Plaintiff Gainor that it might be able to recommend a certain strategy to help reduce his total tax liability on the planned sale.

59.    As more fully set forth above, in or about December of 1998, Plaintiff Gainor sold his business in a transaction that generated a total gain in excess of one hundred and thirty million dollars ($130,000,000).

60.    Unbeknownst to Gainor, at this time Andersen was an established client of Sidley's.

61.    On one or more occasions between January and August of 1999, the exact date or dates of which are not known by Plaintiffs but are well known by Defendants, Andersen, through Marx and Nissley, communicated with Defendant Ruble, then a tax

12

partner at Sidley's predecessor firm Brown & Wood, and perhaps other Sidley representatives, about structuring a transaction to create tax losses for Gainor to offset his gain on the sale of his business.

62.    In July of 1999, Sidley opened a new file for Andersen, with Ruble as the partner in charge, for "structuring tax advantage transactions."

63.    On August 5, 1999, Ruble, then a partner in Defendant Sidley, provided Marx and Nissley with a redacted sample opinion letter that he had prepared for another transaction, knowing and intending that Andersen would rely on it and use it to structure and sell a tax shelter proposal to Gainor.

64.    The strategy proposed by Ruble (hereinafter "Sidley Plan") required involvement of two additional entities in addition to Andersen and Sidley: (a) a financial services firm to loan, hold and transfer money, and importantly, to provide to Gainor the financial advice that would serve as a predicate for claiming that the planned transactions had a legitimate business purpose, a prerequisite for the transactions to have the "economic substance" necessary for the losses arising therefrom to be tax deductible; and (b) an entity to act as purchaser of the assets that would be transferred as part of the strategy.

65.    On one or more occasions between March and August of 1999, the exact date or dates of which are not known by Plaintiffs but are well known by Defendants, Andersen, through Marx and Nissley, contacted Defendant Merrill Lynch about providing the financial services needed to implement the Sidley Plan. Merrill Lynch agreed to fill the financial services role on the Sidley Plan team.

66.    On one or more occasions between March and August of 1999, the exact date or dates of which are not known by Plaintiffs but are well known by Defendants, Andersen, through Marx and Nissley, contacted Defendant Mark Klopfenstein about filling the purchaser role on the Sidley Plan team. Klopfenstein, a former employee of Defendant Andersen, agreed to join the conspiracy and purchase the assets that would be transferred as part of the Sidley Plan.

67.    In August of 1999, Andersen, with Sidley's express or implicit authority, offered to Gainor a "strategy" designed by Sidley (the Sidley Plan) to effectuate a tax savings of approximately seventeen million dollars ($17,000,000) related to the asset sale.    Andersen, through Marx, explained to Gainor that this tax shelter would be supported by an opinion letter from Sidley, on which Gainor could rely, stating that the losses and deductions to be claimed from implementation of the Sidley Plan (which would create the tax savings) would likely be upheld if challenged by the Internal Revenue Service (the "IRS").    Andersen also advised Gainor that it had also met with Merrill Lynch personnel at a recent conference in Phoenix and that Merrill Lynch would assist in effectuating the program.

68.    On August 20, 1999, Andersen, through Marx or Nissley, sent to Gainor via facsimile, a schedule confirming the anticipated professional fees and transaction costs that would be incurred in implementing the strategy. The schedule reflected that fees would be have to be paid to Andersen, Merrill Lynch, Brown & Wood/Sidley, and two entities controlled by Klopfenstein, in the total sum of two million, one hundred thousand dollars ($2,100,000).

69.    On or about September 1, 1999, Gainor authorized Andersen to proceed with implementation of the strategy by the Defendants.

70.    The strategy required a series of complex financial transactions among several different corporate entities. In furtherance of the conspiracy, Andersen coordinated all these activities.

71.    One of the things that Merrill Lynch was required to do as part of the Sidley Plan was to lend money to Gainor, and collateralize the loan with treasury bills purchased with the loan proceeds. The Sidley Plan required that these actions appear to be for a legitimate business purpose. On September 23, 1999, Defendant Merrill Lynch, through its vice president Jeffrey Hunter, sent Plaintiff Gainor a letter extolling the virtues of treasury bills as an investment vehicle and recommending that he purchase them and pledge them as collateral for the loan. Merrill Lynch then made the planned loan to Gainor, purchased treasury bills in Gainor's name with the loan proceeds, and held the treasury bills as collateral for the loan.

72.    Similarly, in November of 1999, Klopfenstein, who was slated to buy companies that had no business activities and no assets except negotiable securities, purported to do "due diligence" on the companies he was to purchase.

73.    On November 23, 1999, Klopfenstein executed two letters of intent on behalf of unnamed entities to purchase all of the outstanding capital stock of Bryan Medical and LSI for a price "subject to the negotiation of the parties."

74.    In the meantime, Andersen and Merrill Lynch, proceeded to coordinate and oversee the execution of a series of complex and costly financial transactions necessary

15

to implementation of the Sidley Plan that were designed to generate over seventy million dollars ($70,000,000) in apparent capital losses.

75.    On December 10, 1999, before all the transactions necessary to implement the Sidley Plan had been accomplished, the IRS released Notice 99-59, "Tax Avoidance Using Distributions of Encumbered Property." Notice 99-59 described certain abusive arrangements which were virtually indistinguishable from the Sidley Plan, and warned that such transactions generate artificial losses lacking economic substance and do not create the type of bona fide losses that are deductible under the Internal Revenue Code.

76.    That same day, Marx and Nissley of Andersen discussed the impact of Notice 99-59 with Ruble of Sidley. Ruble advised that Sidley would still issue the favorable opinion letters for the Gainor transactions notwithstanding Notice 99-59. Ruble admitted to Andersen that Notice 99-59 could impair Gainor's ability to say that he relied in good faith on the advice of a tax professional. Neither Andersen nor Sidley nor any of their representatives ever advised Plaintiff Gainor of this.

77.    Instead, although aware that the IRS had condemned the strategy as an abusive tax shelter whose artificial losses would not be tax deductible, Defendants proceeded to go forward and cause all the planned transactions to be accomplished. On December 14, 1999, phase one of the Sidley Plan was implemented, generating a purported forty million dollar ($40,000,000) capital loss. Likewise, on December 23, 1999, phase two was implemented, generating an additional thirty million, six hundred thousand dollars ($30,600,000) in purported capital losses.

78.    After the transactions were finalized, on December 31, 1999, as promised, Sidley delivered to Gainor two tax opinion letters signed by Ruble. These letters (each

over 50 pages in length) state that the deductions claimed for the capital losses generated by implementation of the strategy would "more likely than not" be upheld if challenged by the IRS.

79.    These opinion letters specifically represent that the subject transactions and consequent deductions claimed would "more likely than not" be upheld if challenged by the IRS.    Sidley, via both pre-transaction representations through Andersen and the finalized opinion letters, represented to Gainor that there was a greater than fifty percent (50%) chance that these losses could legitimately be claimed as deductions and would be upheld if challenged by the IRS.    The opinion letters fail to disclose that Notice 99-59 undermined Gainor's ability to say that he relied in good faith upon the advice of a tax professional.

80.    At all times material, Andersen and Sidley knew or should have known that the deductions were not likely to be upheld if challenged by the IRS; this information was withheld from Gainor.    Indeed, Andersen and Sidley knew or should have known that there was virtually no reasonable possibility that the deductions would be upheld if challenged; yet they told Gainor the exact opposite.

81.    More specifically, Sidley knew, or through the exercise of reasonable care and due diligence, should have known, that it was making one or more of the following material misrepresentations or omissions in both its opinion letters of December 31, 1999 and in its preliminary advice and directives:

        a.    misrepresentations as to the actual <u>risk</u> associated with entering into the subject transactions;

17

b.    failure to disclose that the subject transactions should have been registered as "potentially abusive tax shelters" under 26 U.S.C. § 6111(c) and that investor lists needed to be maintained under 26 U.S.C. § 6112;

c.    failure to disclose Sidley's actual role as an organizer, promoter and seller of these unregistered, potentially abusive tax shelters, its relationship with Andersen and other large accounting firms, and related conflicts of interest which precluded the rendition of objective and "independent" tax opinions;

d.    failing to disclose Sidley's concerns that Gainor's ability to rely in good faith upon the advice of a tax professional was impaired by Notice 99-59; and

e.    misrepresentations regarding the background of the transactions.

82.    Thereafter, as an essential component of the Sidley Plan, Klopfenstein purchased Bryan Medical and LSI from Gainor through two companies he controlled and paid off the Merrill Lynch loan.

83.    Andersen and Klopfenstein inserted in the purchase and sale documents between Gainor and the Klopfenstein entities, a requirement that the tax returns covering the transaction be prepared by Andersen.

84.    In the Spring of 2000, Andersen prepared these tax returns and caused them to be filed with the IRS.

85.    As more fully set forth above, the Defendants agreed with each other to combine their activities in order to induce Plaintiff Gainor to believe that Defendants had

18

crafted a legal "tax strategy" which would yield Gainor over seventeen million dollars ($17,000,000) in tax savings.

86.    The purpose of this conspiracy was to cause Plaintiffs to pay Defendants over two million one hundred thousand dollars ($2,100,000) in fees to implement the Sidley Plan.

87.    Defendants Andersen and Sidley initiated the conspiracy at some point in time between February and August of 1999. The exact date is not known by Plaintiffs but is well known by Defendants.

88.    Defendant Merrill Lynch agreed to join the conspiracy at some point in time between June and August of 1999. The exact date is not known by Plaintiffs but is well known by Defendants.

89.    Defendant Klopfenstein agreed to join the conspiracy at some point in time between June and August of 1999. The exact date is not known by Plaintiffs but is well known by Defendants.

90.    At the time the Defendants agreed to combine together to induce Gainor to implement the Sidley Plan, they knew that the conspiracy had an improper purpose, as each knew that the Sidley Plan was not a legitimate tax avoidance strategy but rather was an illegal tax evasion scheme.

91.    Defendant Andersen undertook numerous acts in furtherance of the conspiracy, including: notifying the other Defendants of the opportunity to present the Sidley Plan to Gainor, recommending the Sidley Plan to Gainor, falsely advising Plaintiff Gainor that the Sidley Plan was a legitimate tax strategy, failing to disclose IRS Notice 99-59 to Plaintiff Gainor, failing to advise Plaintiff Gainor of its prior dealings with

Sidley and Ruble and instead telling Plaintiff Gainor that Sidley would act as "independent" tax opinion counsel, misrepresenting by understatement the actual <u>risk</u> associated with entering into the Sidley Plan, and preparing the tax returns that claimed deductions for the losses attributed to the Sidley Plan transactions.

92.    Defendant Sidley undertook numerous acts in furtherance of the conspiracy, including: on dates not presently known to Plaintiffs but well known to Defendants between March of 1999 and August of 1999, Sidley had communications with Andersen regarding the substance of the transaction explaining how the transactions had to be structured; sending Andersen a sample opinion letter on August 5, 1999; participating in developing a fee structure for the transaction that was presented to Gainor by Andersen on August 20, 1999;  on dates not presently known to Plaintiffs but well known to Defendants between August of 1999 and October of 1999, having discussions with Andersen regarding the substance of the transaction; discussing Klopfenstein with Nissley on September 2, 1999; participating in developing a fee structure for the transaction that was presented to Gainor by Andersen on October 5, 1999; discussing the impact of IRS Notice 99-59 with Andersen on December 10, 1999;  failing to disclose IRS Notice 99-59 to Plaintiffs; and preparing and signing the two opinion letters on December 31, 1999.

93.    Defendant Merrill took numerous acts in furtherance of the conspiracy, including: on dates not presently known to Plaintiffs but well known to Defendants between March of 1999 and August of 1999, Merrill Lynch had communications with Andersen and Sidley regarding the substance of the transaction and how the transactions would be structured; participating in developing a fee structure for the transaction that

was presented to Gainor by Andersen on August 20, 1999; setting up accounts to handle the funds used in the transactions; writing a letter to Gainor recommending the implementation of certain securities transactions in order to carry out the Sidley Plan; and then implementing those transactions.

94. Defendant Klopfenstein took numerous acts in furtherance of the conspiracy, including participating in the development of the fee structure, conducting due diligence on Bryan Medical and LSI, writing letters of intent to purchase Bryan Medical and LSI, purchasing Bryan Medical and LSI, paying off the Merrill Lynch loans, and participating in the filing of the 1999 tax returns that reported the Sidley Plan transactions.

95. In the course of the conspiracy, Defendants made the following misrepresentations of material fact to Plaintiff Gainor:

a. In late February of 1999, Andersen, through Marx and Nissley, advised Gainor that it had a legitimate tax strategy which, if employed, would allow Gainor to legally claim capital losses that would substantially reduce the taxes payable from the sale of his business. This was untrue.

b. On August 20, 1999, Andersen, through Marx and/or Nissley, communicated to Gainor that it had a legitimate tax strategy which, if employed, would allow Gainor to legally claim capital losses that would reduce the taxes payable from the sale of his business substantially, and would cost Gainor less than 16% of the tax saving to employ. This was untrue.

21

c.   On October 5, 1999, Andersen, through Marx and/or Nissley, communicated to Gainor that it had a legitimate tax strategy which, if employed, would allow Gainor to legally claim capital losses that would reduce the taxes payable from the sale of his business by over $17,000,000. This was untrue.

d.   In late February of 1999, and several times thereafter, Andersen, through Marx and/or Nissley, misrepresented the nature of the transaction. It was said to be a safe, legal tax saving strategy. Instead, it was an abusive tax shelter.

e.   In late February of 1999, and several times thereafter, Andersen, through Marx and/or Nissley, misrepresented the risk of entering the transaction. It was said to be a safe, legal tax saving strategy. Instead, it was an abusive tax shelter destined to result in paying the highest taxes possible plus penalties and interest.

f.   In late February of 1999, and several times thereafter, Andersen, through Marx and/or Nissley, misrepresented that the subject transactions and consequent deductions claimed would more likely than not be upheld if challenged by the Internal Revenue Service.

g.   In its December 31, 1999 opinion letters, and several times previously through its agent and co-conspirator Andersen, Sidley, through its partner Ruble, misrepresented the nature of the transaction. It was said to be a safe, legal tax saving strategy. Instead, it was an abusive tax shelter.

22

h.    In its December 31, 1999 opinion letters, and several times previously through its agent and co-conspirator Andersen, Sidley, through its partner Ruble,    misrepresented the risk of entering the transaction.    It was said to be a safe, legal tax saving strategy. Instead, it was an abusive tax shelter destined to result in paying the highest taxes possible plus penalties and interest.

i.    In its December 31, 1999 opinion letters, Sidley, through its partner Ruble, misrepresented that the subject transactions and consequent deductions claimed would more likely than not be upheld if challenged by the Internal Revenue Service.

j.    On September 24, 1999 Merrill Lynch, through its vice president Jeffrey Hunter, advised Gainor that it was a sound business decision to invest in treasury bills, borrow the purchase price from Merrill Lynch, and use the treasury bills as collateral for the loan. This was false.

k.    On September 24, 1999 Merrill Lynch, through its vice president Jeffrey Hunter, advised Gainor that the reason it was recommending that he buy treasury bills and pledge them as loan collateral was because this was a sound business decision. This was false.

l.    On September 24, 1999 Merrill Lynch, through its vice president Jeffrey Hunter, wrote Gainor a letter stating numerous bases for Hunter's recommendation that Gainor invest in treasury bills,

borrow the purchase price from Merrill Lynch, and use the treasury bills as collateral for the loan. This was all false.

m.    In its December 31, 1999 opinion letters, Sidley said that the investments were made for substantial non-tax business reasons. This was false.

n.    In its December 31, 1999 opinion letters, Sidley misrepresented the reasons for the purchase of T-bills on margin.

o.    Andersen and Sidley both failed to disclose to Gainor the fact that IRS Notice 99-59 effectively declared the Sidley Plan to be an abusive tax shelter meaning that claiming deductions would be ineffective and potentially the basis for penalties;

p.    Andersen and Sidley both failed to disclose Sidley's concerns that Mr. Gainor's ability to rely in good faith upon the advice of a tax professional was impaired by Notice 99-59.

q.    Andersen and Sidley both failed to disclose Sidley's actual role as an organizer, promoter and seller of these unregistered, potentially abusive tax shelters, Sidley's prior relationship with Andersen and other large accounting firms in this regard, and related conflicts of interest which precluded the rendition of objective and "independent" tax opinions;

r.    Andersen misrepresented the actual risk associated with entering into the subject transactions;

24

s.       Andersen and Sidley both failed to disclose the actual risk associated with entering into the subject transactions after the issuance of IRS Notice 99-59.

96.     The conspiracy succeeded. In reliance on the representations of Defendants, Plaintiff Gainor implemented the Sidley Plan and paid Defendants over two million one hundred thousand dollars ($2,100,000) in fees to do so.

97.     As a result of the conspiracy, Plaintiff Gainor was damaged in that he was required to pay $2,100,000 in fees to Defendants, additional taxes and interest in an amount exceeding seventeen million dollars ($17,000,000), and substantial additional amounts in professional fees and costs incurred in negotiations with the Internal Revenue Service. In addition, Plaintiffs lost the opportunity to engage in effective tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages, punitive damages, attorneys' fees and costs against Defendants, jointly and severally, and further award Plaintiffs such other relief as this Court deems just and proper in the premises.

## COUNT II
### (Professional Malpractice – Sidley)

98.     Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

99.     In August of 1999, Defendant Sidley, acting through its agent Andersen, agreed to provide Plaintiff Gainor with a legal opinion on the subject transactions in exchange for a fee of $400,000.

100.    As a result Sidley had a duty to exercise reasonable care, skill, and the diligence ordinarily possessed and exercised by attorneys specializing in the field of tax planning, under similar circumstances.

101. Sidley breached this duty and deviated from the acceptable standard of care for a tax specialist in numerous respects.

102. In its December 31, 1999 opinion letters, Sidley specifically represents that the Sidley Plan transactions created losses that could legitimately be claimed as tax deductions, and it was "more likely than not" they would be upheld if challenged by the IRS.

103. At all times material, Sidley knew, or in the exercise of reasonable care should have known, that the deductions were not likely to be upheld if challenged by the IRS. Indeed, Sidley knew or should have known that there was virtually no reasonable possibility that the deductions would be upheld if challenged; yet it told Gainor the exact opposite.

104. Andersen and Sidley both failed to disclose to Gainor the fact that IRS Notice 99-59 effectively declared the Sidley Plan to be an abusive tax shelter meaning that claiming deductions would be ineffective and potentially the basis for penalties;

105. Moreover, Sidley did not accurately or adequately inform Gainor of the actual <u>risk</u> associated with entering into the subject transactions.

106. In addition, Sidley failed to disclose that the subject transactions should have been registered as "potentially abusive tax shelters" under 26 U.S.C. § 6111(c).

107. Further, Sidley should have, but did not, disclose Sidley's actual role as an organizer, promoter and seller of these unregistered, potentially abusive tax shelters, its relationship with Andersen and other large accounting firms, and related conflicts of interest which precluded the rendition of objective and "independent" tax opinions.

108.  Moreover, Sidley failed to disclose its concerns that Gainor's ability to rely in good faith upon the advice of a tax professional was impaired by Notice 99-59.

109.  As a result of Sidley's breaches and deviations, Gainor entered into the Sidley Plan transactions and has suffered damages including, but not limited to, two million one hundred thousand dollars ($2,100,000) in fees and transaction costs paid to Defendants in connection with the Sidley Plan; additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings; payment of over seventeen million dollars ($17,000,000) in additional taxes and interest; and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT III
### (Breach of Contract - Sidley)

110.  Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

111.  At all times material, Andersen had actual or apparent authority to act on behalf of Sidley in connection with the implementation of the Sidley Plan.

112.  In August of 1999, Gainor entered into an oral agreement with Sidley, acting through its agent, Andersen. The express terms were that Sidley, working through Andersen, would advise Gainor on how to structure a complex set of business transactions that would provide over seventeen million dollars (17,000,000) of tax savings related to the sale of Gainor's business. Sidley further agreed to provide "independent," legal opinion letters confirming the propriety of these transactions and opining that the consequent deductions taken would more likely than not be upheld if

27

challenged by the IRS. In consideration thereof, Gainor agreed to pay Sidley four hundred thousand dollars ($400,000).

113. In addition, there were implied terms of the agreement, including that Sidley would exercise reasonable care and diligence in its work, that it would comport with all of its ethical responsibilities, and that it would use that level of skill and care applicable to lawyers holding themselves out as tax planning specialists. Additionally there was implied covenant of good faith and fair dealing.

114. Gainor fully performed his duties under the contract. He implemented the Sidley Plan.

115. Although Sidley delivered the legal opinion letters, it failed to perform its obligations under the contract.

116. Sidley breached the contract by failing to provide a plan that provided over seventeen million dollars (17,000,000) of tax savings.

117. Further, Sidley breached both of the implied covenants set forth in paragraph 112 above. Sidley breached these covenants by its conduct set forth above, including, but not limited to, the acts and omissions more specifically set forth in paragraphs 101-107 hereof, the allegations of which are hereby incorporated herein.

118. As a result of Sidley's breaches, Gainor entered into the Sidley Plan transactions, and has suffered damages including, but not limited to, two million one hundred thousand dollars ($2,100,000) in fees and transaction costs paid to Defendants in connection with the Sidley Plan; additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings; payment of

over seventeen million dollars ($17,000,000) in additional taxes and interest; and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT IV
### (Breach of Contract Implied in Fact - Sidley)

119.   Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

120.   An agreement between Sidley and Gainor arose by implication given the facts and circumstances surrounding the parties' conduct.

121.   Gainor conferred a benefit upon Sidley by paying four hundred thousand dollars ($400,000) to Sidley which was accepted as payment for legal services.

122.   Under ordinary circumstances, a reasonable law firm holding itself out as specializing in tax planning, would reasonably expect to be required to render substantial, competent legal services for such a benefit.

123.   Sidley breached the implied contract with Gainor in failing to render competent legal services by, among other things: (1) failing to exercise such reasonable care, skill, and diligence as is ordinarily exercised by attorneys specializing in the field of tax planning, under similar circumstances; (2) failure to disclose that the subject transactions should have been registered as "potentially abusive tax shelters" under 26 U.S.C. § 6111(c) and that investor lists needed to be maintained under 26 U.S.C. § 6112; (3) failing to disclose Sidley's actual role as an organizer, promoter and seller of these and other unregistered, potentially abusive tax shelters, its relationship with Andersen, and related conflicts of interest which precluded the rendering of objective and

"independent" tax opinions; (4) failing to disclose to Gainor Sidley's concerns that Gainor's ability to rely in good faith upon the advice of a tax professional was impaired by Notice 99-59; and (5) making the material misstatements and omissions set forth in paragraph 93 hereof.

124.   As a result of Sidley's failure to render competent legal advice, Gainor entered into the subject transactions and has suffered damages including, but not limited to, two million one hundred thousand dollars ($2,100,000) in fees and transaction costs paid to Defendants in connection with the Sidley Plan; additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings; payment of over seventeen million dollars ($17,000,000) in additional taxes and interest; and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT V
### (Breach of Contract Implied in Law: Unjust Enrichment - Sidley)

125.   Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

126.   Gainor conferred a benefit upon Sidley by paying four hundred thousand dollars ($400,000) to Sidley.

127.   Sidley knowingly and voluntarily accepted and retained this benefit conferred upon it as compensation for providing competent legal services that were never rendered.

30

128.   Under these circumstances, Sidley would be unjustly enriched if permitted to retain this benefit without having rendered competent legal services, unless Sidley is required to disgorge these professional fees, together with interest, back to Gainor.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

### COUNT VI
### (Negligent Misrepresentation - Sidley)

129.   Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

130.   Sidley held itself out as a tax specialist with a superior knowledge of the subject matter, and it was a standard practice for Sidley to issue tax opinion letters in the ordinary course of its business.

131.   Sidley authorized and encouraged Andersen to utilize Sidley's name and reputation as well as the promise of favorable "more likely than not," Sidley opinion letters, in order to induce Plaintiff Gainor to implement the Sidley Plan and pay Sidley four hundred thousand dollars ($400,000) in fees.

132.   As more fully set forth above in paragraphs 80 and 94 hereof, the allegations of which are hereby incorporated herein, Sidley made numerous false statements or omissions of material fact to Gainor in its opinion letters and in connection with the Sidley Plan.

133.   At the time they were made, Sidley should have known that these representations of material fact were false and that these omissions of fact were material.

134.   Sidley intended that its misrepresentations and omissions of material fact induce Gainor to act in reliance thereon.

31

135.   Gainor justifiably relied on Sidley's misrepresentations and omissions of material fact by entering into the subject transactions and paying substantial fees and transaction costs.

136.   As a result of Sidley's negligent misrepresentations and omissions, Gainor has suffered damages including, but not limited to, over two million one hundred thousand dollars ($2,100,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, payment of over seventeen million dollars ($17,000,000) in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

**COUNT VII**
**(Fraudulent Misrepresentation - Sidley)**

137.   Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

138.   Sidley held itself out as a tax specialist with a superior knowledge of the subject matter, and it was a standard practice for Sidley to issue tax opinion letters in the ordinary course of its business.

139.   Sidley authorized and encouraged Andersen to utilize the Sidley name and reputation as well as the promise of favorable, "more likely than not," Sidley opinion letters, in order to induce Plaintiff Gainor to implement the Sidley Plan and pay Sidley four hundred thousand dollars ($400,000) in fees.

140.  As more fully set forth above in paragraphs 80 and 94 hereof, the allegations of which are hereby incorporated herein, Sidley made numerous false statements or omissions of material fact to Gainor in its opinion letters and in connection with the Sidley Plan.

141.  At the time they were made, Sidley knew that these representations of material fact were false and that these omissions of fact were material

142.  Sidley intended that its misrepresentations and omissions of material fact induce Gainor to act in reliance thereon.

143.  Gainor justifiably relied on Sidley's misrepresentations and omissions of material fact by entering into the subject transactions and paying substantial fees and transaction costs.

144.  As a result of Sidley's fraudulent misrepresentations and omissions, Gainor has suffered damages including but not limited to over two million one hundred thousand dollars ($2,100,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, payment of over seventeen million dollars ($17,000,000) in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages, punitive damages, attorneys' fees and costs against Sidley and such further relief as this Court deems just and proper in the premises.

## **COUNT VIII**
### **(Tortious Interference with an Advantageous Business Relationship by Sidley)**

145.  Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

33

146. Gainor had an established business relationship of trust and confidence with Andersen. Gainor routinely relied on Andersen to provide accounting and consulting services and to protect his financial interests while maintaining the confidentiality of sensitive financial information.

147. Sidley had knowledge that Andersen maintained these types of relationships with clients such as Gainor and had access to such clients' confidential financial information. Sidley knew that Andersen's existing relationships with clients such as Gainor could be utilized to promote unregistered, abusive tax shelters being sold and marketed by Sidley for profit.

148. Sidley intentionally and unjustifiably interfered with Gainor's advantageous business, confidential and fiduciary relationship with Andersen by inducing Andersen to promote the Sidley Plan to Andersen's clients, including Gainor.

149. As a result of Sidley's interference, Gainor entered into the subject transactions and has suffered damages including but not limited to over two million one hundred thousand dollars ($2,100,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, payment of over seventeen million dollars ($17,000,000) in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages and costs, against Sidley and such further relief as this Court deems just and proper in the premises.

## COUNT IX
### (Professional Malpractice - Andersen)

150.   Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

151.   Prior to 1999, Gainor had an established business relationship of trust and confidence with Andersen. Gainor routinely relied on Andersen to provide accounting and consulting services and to protect his financial interests while maintaining the confidentiality of sensitive financial information.

152.   As more fully set forth above, in 1999 Andersen agreed to provide Plaintiff Gainor with a "tax strategy" that would save Gainor seventeen million dollars ($17,000,000) in taxes in exchange for a fee of $583,000.

153.   As a result Andersen had a duty to exercise reasonable care, skill, and the diligence ordinarily possessed and exercised by accountants specializing in the field of tax planning, under similar circumstances.

154.   Andersen breached this duty and deviated from the acceptable standard of care for a tax specialist in numerous respects.

155.   On numerous occasions in 1999, including late February, August 20 and October 5, Andersen, through Marx and Nissley, informed Plaintiff Gainor that the Sidley Plan was a legitimate tax strategy which, if employed, would allow Gainor to legally claim capital losses that would substantially reduce the taxes payable from the sale of his business. This was not the case, and Andersen knew it, or by exercise of the reasonable care, skill, and diligence ordinarily possessed and exercised by accountants specializing in the field of tax planning under similar circumstances, should have known it.

156. On October 5, 1999, Andersen, through Marx and/or Nissley, communicated to Gainor that implementation of the Sidley Plan would allow Gainor to legally claim capital losses that would reduce the taxes payable from the sale of his business by over $17,000,000. This was not the case, and Andersen knew it, or by exercise of the reasonable care, skill, and diligence ordinarily possessed and exercised by accountants specializing in the field of tax planning under similar circumstances, should have known it.

157. In late February of 1999, and several times thereafter, Andersen, through Marx and/or Nissley, misrepresented the nature of the Sidley Plan. It was said to be a safe, legal tax saving strategy. Instead, it was an abusive tax shelter.

158. In late February of 1999, and several times thereafter, Andersen, through Marx and/or Nissley, misrepresented the risk of implementing the Sidley Plan. It was said to be a safe, legal tax saving strategy. Instead, it was an abusive tax shelter destined to result in paying the highest taxes possible plus penalties and interest.

159. In late February of 1999, and several times thereafter, Andersen, through Marx and/or Nissley, misrepresented that the subject transactions and consequent deductions claimed would more likely than not be upheld if challenged by the Internal Revenue Service.

160. At all times material, Andersen knew, or in the exercise of reasonable care should have known, that the deductions were not likely to be upheld if challenged by the IRS. Indeed, Andersen knew or should have known that there was virtually no reasonable possibility that the deductions would be upheld if challenged; yet it told Gainor the exact opposite.

161.   Further, Andersen failed to disclose to Gainor that Notice 99-59 would impair Gainor's ability to say that he relied in good faith upon the advice of a tax professional.

162.   Further, Andersen should have, but did not, disclose Sidley's role as an organizer, promoter and seller of these unregistered, potentially abusive tax shelters and Sidley's relationship with Andersen and other large accounting firms, which precluded Sidley from the rendering objective and "independent" tax opinions.

163.   As a result of Andersen's breaches and deviations, Gainor entered into the Sidley Plan transactions and has suffered damages including, but not limited to, two million one hundred thousand dollars ($2,100,000) in fees and transaction costs paid to Defendants in connection with the Sidley Plan; additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings; payment of more than seventeen million dollars ($17,000,000) in additional taxes and interest; and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages and costs, against Andersen, and such further relief as this Court deems just and proper in the premises.

### COUNT X
### (Breach of Contract - Andersen)

164.   Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

165.   On September 1, 1999, Gainor entered into a written agreement with Andersen.   The express terms were that Andersen, would advise Gainor on how to structure a complex set of business transactions that would provide over seventeen million dollars (17,000,000) of tax savings related to the sale of Gainor's business.

Andersen further agreed to obtain "independent," legal opinion letters from Sidley confirming the propriety of these transactions and opining that the consequent deductions taken would more likely than not be upheld if challenged by the IRS. Indeed, Andersen promised to take no fee whatsoever if it did not supply these opinion letters from Sidley In exchange, Gainor agreed to pay Sidley fees estimated at five hundred eighty-three thousand dollars ($583,000).

166. In addition, there were implied terms of the agreement, including that Andersen would exercise reasonable care and diligence in its work, that it would comport with all of its ethical responsibilities, and that it would use that level of skill and care applicable to accountants holding themselves out as tax planning specialists. Additionally there was implied covenant of good faith and fair dealing.

167. Gainor fully performed his duties under the contract. He implemented the transactions Andersen specified, the Sidley Plan.

168. Although Andersen delivered the Sidley legal opinion letters, it failed to perform its obligations under the contract.

169. Andersen breached the contract by failing to provide a plan that provided over seventeen million dollars (17,000,000) of tax savings.

170. Andersen further breached both of the implied covenants set forth in paragraph 164 above. Andersen breached these covenants by its conduct set forth above, including, but not limited to, the material misrepresentations and/or omissions more specifically set forth in paragraph 94 hereof, the allegations of which are hereby incorporated herein, and the matters set forth in paragraphs 154-161 hereof, the allegations of which are hereby incorporated herein.

171.    As a result of Andersen's breaches, Gainor entered into the Sidley Plan transactions, and has suffered damages including, but not limited to, two million one hundred thousand dollars ($2,100,000) in fees and transaction costs paid to Defendants in connection with the Sidley Plan; additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings; payment of seventeen million dollars ($17,000,000) in additional taxes and interest; and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages and costs, against Andersen, and such further relief as this Court deems just and proper in the premises.

### COUNT XI
### (Negligent Misrepresentation - Andersen)

172.    Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

173.    Prior to 1999, Gainor had an established business relationship of trust and confidence with Andersen. Gainor routinely relied on Andersen to provide accounting and consulting services and to protect his financial interests while maintaining the confidentiality of sensitive financial information. Andersen accepted this trust. As a result, Andersen and Gainor had a confidential relationship, and Andersen owed Gainor a fiduciary duty of good faith and fair dealing.

174.    Andersen held itself out as a tax specialist with a superior knowledge of the subject matter, and it was a standard practice for Andersen to provide tax advice in the ordinary course of its business.

175.    As more fully set forth above, in 1999 Andersen agreed to provide Plaintiff Gainor with a "tax strategy" that would save Gainor seventeen million dollars ($17,000,000) in taxes in exchange for a fee of $583,000.

176.    As more fully set forth above in paragraphs 94 and 154-161 hereof, the allegations of which are hereby incorporated herein, Andersen made numerous false statements or omissions of material fact to Gainor in connection with the Sidley Plan.

177.    At the time they were made, Andersen should have known that these representations of material fact were false and that these omissions of fact were material.

178.    Andersen intended that its misrepresentations and omissions of material fact induce Gainor to act in reliance thereon.

179.    Gainor justifiably relied on Andersen's misrepresentations and omissions of material fact by entering into the Sidley Plan transactions and paying substantial fees and transaction costs.

180.    As a result of Andersen's negligent misrepresentations and omissions, Gainor has suffered damages including, but not limited to, over two million one hundred thousand dollars ($2,100,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, payment of more than seventeen million dollars ($17,000,000) in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages and costs, against Andersen, and such further relief as this Court deems just and proper in the premises.

## COUNT XII
### (Fraud by Andersen)

181.    Plaintiffs reallege paragraphs 1 through 50 as though fully set forth herein.

182.    Prior to 1999, Gainor had an established business relationship of trust and confidence with Andersen. Gainor routinely relied on Andersen to provide accounting and consulting services and to protect his financial interests while maintaining the confidentiality of sensitive financial information. Andersen accepted this trust. As a result, Andersen and Gainor had a confidential relationship, and Andersen owed Gainor a fiduciary duty of good faith and fair dealing

183.    Andersen held itself out as a tax specialist with a superior knowledge of the subject matter, and it was a standard practice for Andersen to provide tax advice in the ordinary course of its business.

184.    As more fully set forth above, in 1999 Andersen agreed to provide Plaintiff Gainor with a "tax strategy" that would save Gainor seventeen million dollars ($17,000,000) in taxes in exchange for a fee of $583,000.

185.    As more fully set forth above in paragraphs 94 and 154-161 hereof, the allegations of which are hereby incorporated herein, Andersen made numerous false statements or omissions of material fact to Gainor in connection with the Sidley Plan.

186.    At the time they were made, Andersen should knew that these representations of material fact were false and that these omissions of fact were material.

187.    Andersen intended that its misrepresentations and omissions of material fact induce Gainor to act in reliance thereon.

41

188.   Gainor justifiably relied on Andersen's misrepresentations and omissions of material fact by entering into the Sidley Plan transactions and paying substantial fees and transaction costs.

189.   As a result of Andersen's material misrepresentations and omissions, Gainor has suffered damages including, but not limited to, over two million one hundred thousand dollars ($2,100,000) in professional fees and transaction costs incurred in connection with the Sidley Plan, additional fees and costs incurred in connection with participation in the IRS Voluntary Disclosure Plan and related IRS dealings, payment of over seventeen million dollars ($17,000,000) in additional taxes, and lost opportunities for proper tax planning.

WHEREFORE, Plaintiffs, Mark J. Gainor and Elyse Gainor, respectfully request that this Court award compensatory damages, punitive damages, attorneys' fees and costs against Andersen, and such further relief as this Court deems just and proper in the premises.

## DEMAND FOR JURY TRIAL

Plaintiffs, Mark J. Gainor and Elyse Gainor, demand a jury trial on all issues so triable.

RICHARD BENJAMIN WILKES
Florida Bar No. 267163
**RICHARD BENJAMIN WILKES, P.A.**
600 South Magnolia Avenue, Suite 200
Tampa, Florida 33606
Telephone:    (813) 254-6060
Facsimile:    (813) 254-6088
rwilkes@rbwilkes.com
Attorneys for Plaintiffs