# EXHIBIT N

Dockets.Justia.com

STOCK PURCHASE AGREEMENT

by and between

LSI HOLDINGS, LLC

and

MJG PARTNERS, L.P.

Dated as of December 23, 1999



DEPOSITION EXHIBIT

9

GAINO 003269

# CONTENTS

ARTICLE I    SALE AND PURCHASE OF STOCK ........................................................... 1
    1.1    Agreement to Sell and Purchase Stock............................................ 1
    1.2    Purchase Price ............................................................................... 1

ARTICLE II    REPRESENTATIONS AND WARRANTIES OF THE SHAREHOLDER ... 2
    2.1    Ownership of Shares ..................................................................... 2
    2.2    Capacity and Validity .................................................................... 2
    2.3    Organization and Standing of the Company; Capacity and Validity ............... 2
    2.4    Capital Stock ................................................................................. 2
    2.5    Noncontravention; Consents .......................................................... 3
    2.6    Financial Statements ..................................................................... 3
    2.7    Litigation and Claims .................................................................... 3
    2.8    No Undisclosed Liabilities; Liens ................................................. 3
    2.9    Real Property ................................................................................ 3
    2.10    Tangible Personal Property .......................................................... 4
    2.11    Intellectual Property ..................................................................... 4
    2.12    Intangible Property; Subsidiaries ................................................. 4
    2.13    Compliance with Laws ................................................................. 4
    2.14    Benefit Plans ................................................................................ 4
    2.15    Union and Employment Agreements ............................................ 5
    2.16    Contracts and Commitments ........................................................ 5
    2.17    Insurance Policies ........................................................................ 5
    2.18    Taxes ............................................................................................ 5
    2.19    Bank Accounts and Powers of Attorney ....................................... 6
    2.20    Products Liability; Warranties ..................................................... 7
    2.21    Environmental Matters ................................................................. 7
    2.22    Statements True and Correct ........................................................ 7

ARTICLE III    REPRESENTATIONS AND WARRANTIES OF PURCHASER ................. 7
    3.1    Organization, Standing and Authority of the Purchaser ............... 7
    3.2    Noncontravention .......................................................................... 8
    3.3    Investment Intent .......................................................................... 8

ARTICLE IV    ADDITIONAL COVENANTS ...................................................................... 8
    4.1    Cooperation ................................................................................... 8
    4.2    Related Party Transactions ........................................................... 8
    4.3    Transfer Taxes .............................................................................. 8
    4.4    Tax Matters ................................................................................... 8
    4.5    Value of Company Assets ............................................................. 9
    4.6    Termination of Employee Plans ................................................. 10

ARTICLE V    ACTIONS TAKEN ON EXECUTION BY SHAREHOLDER ..................... 10
    5.1    The Shares ................................................................................... 11
    5.2    Releases ...................................................................................... 11
    5.3    Resignations ............................................................................... 11
    5.4    Legal Opinion ............................................................................. 11
    5.5    Consents ..................................................................................... 11
    5.6    FIRPTA Certificate ..................................................................... 11

\\A01\VOL1\CRPDATA\USERS\AEH\WORD\TRANSTAR\LSI-SPA3.DOC

GAINO 003270

ARTICLE VI    ACTIONS TAKEN ON EXECUTION BY THE PURCHASER.................. 11

ARTICLE VII   INDEMNIFICATION ...................................................................... 11
7.1    Indemnification of Purchaser................................................... 11
7.2    Indemnification of Shareholder................................................ 12
7.3    Notice and Opportunity to Defend.......................................... 12
7.4    Survival of Representations and Warranties; Rights Not Affected by
       Knowledge................................................................................ 12
7.5    Subrogation............................................................................... 12
7.6    Guaranty of Mark J. Gainor ................................................... 12
7.7    Limitation of Indemnification .................................................. 13
7.8    Limitation as Exclusive Remedy .............................................. 13

ARTICLE VIII  MISCELLANEOUS PROVISIONS .......................................... 13
8.1    Definitions................................................................................ 13
8.2    Notices...................................................................................... 15
8.3    Expenses .................................................................................. 16
8.4    Waiver ...................................................................................... 16
8.5    Assignment............................................................................... 16
8.6    Binding Effect.......................................................................... 17
8.7    Governing Law; Severability; Remedies .................................. 17
8.8    Counterparts ............................................................................ 17
8.9    Brokers ..................................................................................... 17
8.10   Schedules and Exhibits ........................................................... 17
8.11   Headings ................................................................................... 17
8.12   Entire Agreement..................................................................... 17

\\AOI\VOL\CRPDATA\USERS\AEH\WORD\TRANSTAR\LSI-SPA3.DOC

GAINO 003271

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is entered into this 23d day of December, 1999, by and among LSI Holdings, LLC, a Georgia limited liability company (the "Purchaser"), and MJG Partners, L.P., a Georgia limited partnership (the "Shareholder"). Certain terms used in this Agreement are defined in Section 8.1 hereof.

## W I T N E S S E T H:

WHEREAS, the Shareholder owns all of the issued and outstanding shares (collectively, the "Shares") of common stock, no par value, of Lucor Special Investments, Inc., a Georgia corporation (the "Company"); and

WHEREAS, the parties desire to enter into this Agreement pursuant to which Purchaser shall purchase from the Shareholder, and the Shareholder shall sell to the Purchaser, all of the Shares, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual representations, warranties and covenants contained herein and other good and valuable consideration, the mutuality, receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## SALE AND PURCHASE OF STOCK

1.1    Agreement to Sell and Purchase Stock.  For and in consideration of the Purchase Price set forth in Section 1.2, the Shareholder hereby sells, assigns, transfers, conveys and delivers to the Purchaser, free and clear of all Liens, and the Purchaser hereby purchases and acquires from the Shareholder, the Shares.

1.2    Purchase Price.  At Closing, the Purchaser shall transfer to Shareholder ONE HUNDRED TWENTY FIVE THOUSAND SEVEN HUNDRED FIFTY FIVE AND NO/100 U.S. DOLLARS (U.S. $125,755.00) (the "Purchase Price") by wire transfer of immediately available federal funds to an account designated by the Shareholder.  The Shareholder hereby acknowledges the receipt of the Purchase Price, subject to the terms and conditions herein, as payment in full for all of the Shares.

1.3    Closing.  The consummation of the purchase and sale of the Shares and other related matters (the "Closing") shall occur on December __, 1999, at the offices of King & Spalding, located at 191 Peachtree Street, N.E., Atlanta, Georgia 30303, or at such other time, date and place as the parties shall agree.

H:\AEH\WORD\TRANSTAR\LSI-SPA4.DOC

GAINO 003272

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE SHAREHOLDER

As an inducement to the Purchaser to enter into this Agreement and to purchase the Shares, the Shareholder represents and warrants to the Purchaser as set forth below:

2.1  Ownership of Shares.  The Shareholder is the owner of all right, title and interest (legal, record and beneficial) in and to the Shares, free and clear of any and all Liens, and the Shares constitute all of the issued and outstanding capital stock of the Company.  The delivery to the Purchaser of a certificate evidencing all of the Shares, together with a stock power endorsed in favor of Purchaser, pursuant to the provisions of this Agreement will transfer to the Purchaser good and marketable title to all of the Shares, free and clear of all Liens.  Except as specifically contemplated by this Agreement, no Person has any Contract, right or privilege (whether pre-emptive or contractual) capable of becoming a Contract, right to or option for the purchase of any of the Shares from Shareholder, and none of the Shares constitute community property under the Laws of any jurisdiction.

2.2  Capacity and Validity.  Shareholder is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Georgia.  Shareholder has the unrestricted right, power, capacity and authority under its certificate of limited partnership, partnership agreement and applicable law to execute, deliver and perform its obligations under this Agreement and all other documents contemplated hereby according to their respective terms, and to consummate the transactions contemplated hereby and thereby.  This Agreement and each other agreement contemplated hereby has been or will be duly executed and delivered by Shareholder, and shall constitute the legal, valid and binding obligation of Shareholder, enforceable against it in accordance with their terms.

2.3  Organization and Standing of the Company; Capacity and Validity.  The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of Georgia, and has the corporate power and authority to carry on its business as it has been and is now being conducted and to own, operate and lease the Assets which it now owns, operates or leases.  The Company is duly qualified and/or licensed to transact business in all of the jurisdictions where the character of the Assets owned, operated or leased by the Company and the nature of the business conducted by it require such qualification and/or licensing.  The Company is not, and has never been, an "investment company" within the meaning of the Investment Company Act of 1940.  Copies of the articles of incorporation and the bylaws of the Company and all amendments thereto were delivered to the Purchaser.  Such documents are true and complete and in full force and effect on the date of this Agreement.  The corporate minutes of the Company, copies of which (to the extent set out in writing) have been delivered to the Purchaser, are (i) true and complete in all material respects on and as of the date of this Agreement and (ii) accurately reflect in all material respects all proceedings of the shareholders and directors of the Company (and all committees thereof).  Schedule 2.3 lists the names of all directors and officers of the Company.

2.4  Capital Stock.  The authorized capital stock of the Company consists of 140,000 shares of common stock, no par value per share, 100 of which are issued and outstanding.  Shareholder owns of record and beneficially all of the outstanding Shares.  No shares are held in the treasury of the Company.  All of the Shares have been duly and validly issued, and are fully paid and nonassessable.  All of the Shares were issued pursuant to a valid exemption from registration under the Securities Act and all applicable state securities Laws.  Other than the

- 2 -

GAINO 003273

Shares, there are no outstanding Equity Rights in the Company, no outstanding rights to demand registration, or to sell in connection with a registration by the Company under the Securities Act, and no other Contracts of the Company or Shareholder of any nature relating to the Shares or any other Equity Rights in the Company. The Company is not obligated to issue any Equity Rights in the Company for any purpose. The stock record book of the Company, which has been delivered to the Purchaser for review, contains true, complete and accurate records of the stock ownership of the Company and the transfer of the shares of its capital stock.

2.5    Noncontravention; Consents. Neither the execution, delivery and performance by the Shareholder of this Agreement and any other documents contemplated hereby (with or without the giving of notice, the lapse of time, or both) nor the consummation of the transactions contemplated hereby (i) requires the consent or approval of, prior filing with or notice to, or other action by, any Regulatory Authority or any other third party (other than any such consent or approval that has been obtained and is in full force and effect); (ii) conflicts with any provision of the Company's articles of incorporation or bylaws; (iii) constitutes a Default under any Law or Order to which Shareholder or the Company is a party or by which Shareholder, the Company or the Company's Assets are bound; (iv) constitutes a Default under any Contract or Permit to which Shareholder or the Company is a party or by which Shareholder, the Company or the Company's Assets are bound; or (v) will create any Lien upon the Shares or any of the Assets of the Company.

2.6    Financial Statements. Attached hereto as Schedule 2.6 are the Company's federal income tax returns for the twelve months ended December 31, 1998 and June 30, 1997 and for the period beginning July 1, 1997 and ending December 31, 1997, the Company's unaudited balance sheet as of December 17, 1999 and an income statement of the Company for the period from the termination of S-election status through December 17, 1999 (collectively, the "Financial Statements"). The Financial Statements present fairly the financial condition, Assets and Liabilities of the Company as of December 17, 1999 and present fairly the results of the Company's income for the period beginning December 22, 1999 and ending December 27, 1999.

2.7    Litigation and Claims. Except as set forth on Schedule 2.7, there is no Litigation pending, or (to Shareholder's Knowledge) threatened against or affecting the Company or its Assets or business in any court or before any arbitrator or Regulatory Authority, and to the best knowledge of Shareholder, there is no event that has occurred or circumstances that exist that serve(s) as a reasonable basis for the commencement of any Litigation that would have any effect on the financial condition, Assets or business of the Company. There are no unsatisfied Orders against the Company or any Orders to which the Company is subject.

2.8    No Undisclosed Liabilities; Liens. Except for Liabilities set forth on Schedule 2.8, or as otherwise agreed to by the parties in writing, the Company has no Liabilities except those recorded on the most recent Financial Statements. Except as set forth on Schedule 2.8, the Company has good and marketable title to all of its Assets, free and clear of all Liens and all of its Assets are freely transferable without any restrictions, including, with respect to any of the Assets which are Equity Rights (such as the "Company Investment(s)"), freely transferable under the Securities Act and all applicable state securities Laws in one or more transactions on a national securities exchange or automated quotations system.

2.9    Real Property. The Company does not own or lease any real property. The Company does not lease any real property as lessor.

- 3 -

GAINO 003274

2.10    Tangible Personal Property.    The Company does not own, lease or use any tangible personal property.

2.11    Intellectual Property.    Schedule 2.11 contains a true and complete list of all Intellectual Property owned by, registered in the name of, or used by the Company and all license agreements or other Contracts in connection therewith. The Company owns or uses all of such Intellectual Property free of any Liens, except as set forth on Schedule 2.11. The Company is not obligated to make any payments to any Person with respect to any such Intellectual Property, except as set forth on Schedule 2.11.

2.12    Intangible Property; Subsidiaries.    The Company does not own any intangible property, except as otherwise set forth in Schedule 2.12. Except as set forth on Schedule 2.12, the Company does not own, directly or indirectly, any capital stock or other Equity Rights or other ownership or investment interest in any other Person. All intangible property or Equity Rights of the Company are held exclusively in accounts as indicated on Schedule 2.12. The Company has taken all necessary actions such that, immediately upon transfer of the Shares by the Shareholder to the Purchaser, the officers of the Company duly appointed by the board of directors of the Company as constituted immediately after the Closing shall have the authority to direct all investment decisions with respect to all intangible property and Equity Rights held in the accounts described on Schedule 2.12, subject in each case to the terms and conditions of such intangible property, Equity Rights and the agreements governing such accounts.

2.13    Compliance with Laws.    The Company is not in Default under, and is currently and has been in compliance in all respects with, all Laws applicable to it, its business and the ownership and present uses of its Assets. The Company has obtained all Permits that are required for the ownership, maintenance and operation of the Company's Assets and business. The Company is not presently nor has it, in the last two (2) years, been in Default under any such Permit. None of the Permits held by the Company will be adversely affected in any way by reason of this Agreement or the consummation of the transactions contemplated herein. Since December 31, 1997, no notice or warning from any Regulatory Authority with respect to any failure or alleged failure of the Company to comply with any Law has been received by the Company or Shareholder.

2.14    Benefit Plans.    Schedule 2.14 contains a complete and accurate list of (i) every pension, retirement, profit-sharing, deferred compensation, stock option, employee stock ownership, severance pay, vacation, bonus or other incentive plan, any other written or unwritten employee program, arrangement, agreement or understanding, whether arrived at through collective bargaining or otherwise, (ii) every medical, vision, dental or other health plan, and life insurance plan, and (iii) any other employee benefit plan or fringe benefit plan, including, without limitation, any "employee benefit plan," as that term is defined in Section 3(3) of ERISA (collectively, the "Benefit Plans"), adopted, maintained by, sponsored in whole or in part by, or contributed to by the Company or an Affiliate of the Company for the benefit of the Company's employees, retirees, directors, independent contractors, or other beneficiaries or their dependents or spouses (collectively, the "Company Benefit Plans"). The Company has no liability with respect to the Company Benefit Plans (or any such benefit plans formerly adopted, maintained, sponsored in whole or in part, or contributed to, by the Company or any Affiliate of the Company but no longer in force or effect) or the termination thereof, that will become a liability of Purchaser after the sale of the Shares.

- 4 -

GAINO 003275

2.15    Union and Employment Agreements.  The Company is not a party to any union agreement, nor does the Company have any Contract with any of its officers, directors, employees, consultants, agents, or any other person performing services for the Company, relating to their employment by or performance of services for the Company or their compensation therefor.  No union attempts to organize the employees of the Company have been made, nor to Shareholder's Knowledge, are any such attempts now threatened.

2.16    Contracts and Commitments.  Except as set forth in Schedule 2.16, or as otherwise expressly agreed to in writing by the Purchaser, the Company is not a party to or subject to (and its Assets are not subject to) any Contract.  Except as set forth in Schedule 2.16, the Company is not in Default under any Contract to which it is a party or to which its Assets are subject.

2.17    Insurance Policies.  Schedule 2.17 sets forth a complete list and description of all insurance policies in force naming the Company as an insured or beneficiary or as a loss payee or for which the Company has paid or is obligated to pay all or part of the premiums, including, without limitation, all liability, fire, health and life insurance policies.  The Company has not received notice of any pending or threatened termination or premium increase (retroactive or otherwise) with respect thereto, and the Company is in compliance with all conditions contained in said policies listed in Schedule 2.17.  Except as set forth on Schedule 2.17, there are no pending claims against such insurance by the Company as to which insurers are defending under reservation of rights or have denied liability.

2.18    Taxes.

(a)    The Company properly and timely elected to be taxed as an S corporation for federal and state Tax purposes under Subchapter S of the Code (or similar Laws in each jurisdiction in which it is carrying on or has carried on any business) for its taxable year beginning November 11, 1999 ("S Election").  The S Election remained in full force and effect continuously until its termination in accordance with Section 1362(d)(2) of the Code effective December 23, 1999.  Gainor Medical U.S.A. Inc. properly and timely elected to be taxed as an S corporation for federal and state Tax purposes under Subchapter S of the Code (or similar Laws in each jurisdiction in which it is carrying on or has carried on any business) for its taxable year beginning July 1, 1997 ("S Election").  The S Election remained in full force and effect continuously until the effectiveness of the merger of Gainor Medical U.S.A. Inc. with and into the Company.  The Company has never owned or acquired stock in a "qualified subchapter S subsidiary" within the meaning of Section 1361(b)(3) of the Code.

(b)    Schedule 2.18 lists the taxable years and periods through which the Company has filed federal, state and local Tax Returns, stating whether any such returns have been examined by the IRS or any state or local taxing authority with respect to any such period, and stating, in each instance, all open deficiencies, if any, proposed as a result of all such examinations, and stating whether such deficiencies have been paid or settled and listing any powers of attorney given by the Company empowering the Person named therein to act on behalf of the Company in connection with any Tax matters.  Except as listed on Schedule 2.18, the Company has not received notice of any Tax claims being asserted against the Company or any proposed assessment by any taxing authority, and no Tax Returns of the Company have been examined by the IRS or the appropriate state or local taxing authorities for any taxable year or period or portion thereof on or prior to the date hereof.  The Company is not presently under, nor

- 5 -

GAINO 003276

has it received notice of any contemplated, investigation or audit by the IRS or any state or local taxing authority concerning any taxable year or period or portion thereof on or prior to the date hereof.

(c)     As of the date hereof, the Company has timely filed all Tax Returns required to be filed on or prior to the date hereof, and such returns are complete and correct in all respects and properly and accurately reflect the Tax Liabilities of the Company (including any Taxes imposed by Subchapter S of the Code) for the periods, property or events covered thereby, and except as set forth on Schedule 2.18, the Company has paid all Taxes with respect to any taxable period or portion thereof on or prior to the date hereof whether or not shown on such returns. The Company is not the beneficiary of any extension of time to file any Tax Return.

(d)     Schedule 2.18 lists all Tax Liabilities of the Company (including any Taxes imposed by Subchapter S of the Code) attributable to any taxable period or portion thereof on or before the date hereof but that are not required to be paid prior to the date hereof and for all current and deferred Taxes. Schedule 2.18 lists all Tax Returns of the Company that have not yet been filed for any taxable period beginning before the date hereof.

(e)     The Company and each of its predecessors and Affiliates to which it has succeeded has withheld or collected from each payment made to each of their employees or other payees the amount of all Taxes required to be withheld or collected therefrom and the Company and each of its predecessors and Affiliates to which it has succeeded has paid the same to the proper Tax depositories or collecting authorities.

(f)     All ad valorem property Taxes for years prior to 1999 imposed on the Company and each of its predecessors or its Affiliates to which it has succeeded with respect to, or which may become a Lien on, its Assets have been paid in full.

(g)     Neither the Company nor any of its predecessors nor any of its Affiliates to which it has succeeded has ever made an election under section 341(f) of the Code.

(h)     The Company has not agreed, nor is it required to make as a part of any transaction contemplated herein, an adjustment under Section 481 of the Code (or similar provision of state or local Law) by reason of a change in method of accounting or otherwise.

(i)     The Company has not made any payments, is not obligated to make any payments, and is not a party to any Contract (including this Agreement) that could obligate it to make any payments that would be disallowed as a deduction under Section 280G or 162(m) of the Code.

(j)     The Company is not a party to any Tax allocation, indemnity or sharing agreement or arrangement and the Company has not been a member of an affiliated group filing a consolidated federal income Tax Return; the Company does not have any Liability for Taxes of any Person (other than Company) pursuant to Treasury Regulation Section 1.1502-6, as a transferee or successor, or by Contract, or otherwise.

2.19     Bank Accounts and Powers of Attorney. A list of the names and addresses of each bank, together with the name and number of each account, in which the Company has an account or safe-deposit box, the names of all persons entitled to draw thereon or to have access thereto, and

- 6 -

GAINO 003277

the names of any persons holding powers of attorney with respect to the Company, are set forth in Schedule 2.19.

2.20    Products Liability; Warranties.  The Company shall have no Liability after the Closing Date not fully covered by insurance or warranties from third parties relating to any product manufactured, distributed or sold by the Company prior to the consummation of the transactions contemplated hereby, whether or not such Liability relates to products that are defective or improperly designed or manufactured or in breach of any express or implied product warranty.  Schedule 2.20 discloses and describes the terms of all express product warranties under which the Company may have liability after the date hereof.

2.21    Environmental Matters.  The Company has operated in compliance with all applicable environmental laws and is not subject to any Liability (including legal fees) and will not hereafter suffer or incur any Liability (including legal fees) by virtue of any violation of any environmental law occurring prior to the date hereof, any environmental activity conducted on or with respect to any real property owned, used or leased by the Company at or prior to the date hereof or any environmental condition existing on or with respect to any real property owned, used or leased by the Company at or prior to the date hereof, in each case whether or not the Company permitted or participated in such act or omission.  The Company has not treated, stored, recycled or disposed of any regulated material on any real property, and no other Person has treated, stored, recycled or disposed of any regulated material on any part of the real property owned, used or leased by the Company.  There has been no release of any regulated material at, on or under any real property or any real property previously owned, used or leased by the Company.  There has been no past or pending, and to the knowledge of Shareholder, there is no contemplated, claim by or against the Company under any environmental law, and the Company has not entered into any agreement with any Person regarding any environmental law, remedial action or other environmental Liability or expense.  Shareholder hereby warrants and represents to Purchaser that neither the Purchaser nor the Company will incur any loss, liability, damage, cost or expense in connection with any actual, threatened, claimed, alleged violation or noncompliance with or of environmental laws or any investigation relating to the same.

2.22    Statements True and Correct.  No representation or warranty made by Shareholder herein, nor any statement, certificate or instrument furnished or to be furnished to the Purchaser pursuant to this Agreement or any other such document, agreement or instrument referred to herein or therein, contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.  All of the representations and warranties of Shareholder, disregarding all qualifications and exceptions contained therein relating to materiality, are true and correct with only such exceptions as would not in the aggregate reasonably be expected to have a material adverse effect on the Company.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

As an inducement to the Shareholder to enter into this Agreement and to sell the Shares, the Purchaser hereby represents and warrants to the Shareholder the following:

3.1    Organization, Standing and Authority of the Purchaser.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of

- 7 -

GAIN0 003278

the State of Georgia. The Purchaser has the requisite power and authority to execute, deliver and perform its obligations under this Agreement and all other documents contemplated hereby according to their respective terms, and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by the Purchaser, and constitutes the legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

3.2    Noncontravention.   Neither the execution, delivery and performance by the Purchaser of this Agreement and any other documents contemplated hereby (with or without the giving of notice, the lapse of time, or both) nor the consummation by Purchaser of the transactions contemplated hereby: (i) requires the consent or approval of, prior filing with or notice to, or other action by, any Regulatory Authority or any other third party; (ii) conflicts with any provision of the Purchaser's organizational documents; or (iii) constitutes a Default under any Law or Order to which the Purchaser is a party or by which Purchaser or its assets are bound.

3.3    Investment Intent.   The Purchaser is acquiring the Shares for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act. The Purchaser was motivated to invest in the Company after private negotiations and was not induced to purchase the Shares through any form of general or public solicitations or advertisements.

# ARTICLE IV
## ADDITIONAL COVENANTS

4.1    Cooperation .   Each party covenants that it will, from time to time after the date hereof, timely execute such additional instruments and timely take such actions as may be reasonably requested by any other party hereto to confirm or perfect or otherwise to carry out the intent and purpose of this Agreement.

4.2    Related Party Transactions.   Except for indebtedness described on Schedule 4.2, the Shareholder shall cause all indebtedness and other Liabilities owed to the Company by Shareholder or any Affiliate of the Company or Shareholder to be paid and/or satisfied, as applicable, in full on or prior to the date hereof, and shall cause all indebtedness and other Liabilities owed by the Company to Shareholder or any Affiliate of Shareholder to be discharged and released in full on or prior to the date hereof.

4.3    Transfer Taxes.   The Shareholder shall pay any and all transfer, sales, use and similar Taxes on the transfer of the Shares.

4.4    Tax Matters.

(a)    Tax Disputes.   Notwithstanding anything contained in this Agreement to the contrary, in the case of any notice of any audit, examination or other proceeding with respect to Taxes (or Liabilities related thereto) of the Company for which Shareholder may be liable (by way of indemnification pursuant to this Agreement), (i) this Section 4.4(a) shall apply in lieu of Section 7.3, and (ii) Shareholder and Purchaser shall promptly inform the other of such notice and, if within thirty (30) days after receipt of such notice, Shareholder gives Company and Purchaser written notice of his election to control such proceedings, Shareholder shall control the conduct of such proceedings (except as provided herein) with legal counsel reasonably acceptable to

- 8 -

GAINO 003279

Purchaser; provided, however, that Shareholder shall not settle, compromise or abandon any matter or claim (or portion thereof) with respect to such proceedings unless (i) a condition of such agreement, compromise or abandonment is the unconditional release of all claims asserted against the Company or (ii) Purchaser shall have given its prior written consent, which consent shall not be unreasonably withheld. In the event Shareholder elects to exercise such option to control the conduct of such proceedings, (i) Shareholder shall keep Company and Purchaser duly and promptly informed of any such proceedings, and (ii) Purchaser shall be entitled to promptly receive copies of all correspondence and documents relating to such proceedings and may, at its option, participate in such proceedings (including any associated meetings or conferences); provided, that Purchaser shall not be entitled to any such copies or to participate in any such meetings or conferences to the extent that, in the good faith opinion of counsel to the Shareholder, the receipt of such copies or the participation by Purchaser in such meetings or conferences could constitute a waiver of Shareholder's attorney-client privilege or could impair Shareholder's ability to successfully assert the attorney work-product doctrine in any legal proceeding. In the event Shareholder does not timely elect to exercise such option to control the conduct of such proceedings (or, after electing to control such proceedings, Shareholder fails to take reasonable steps to defend any such claim or matter), at Shareholder's sole cost and expense, Purchaser shall notify Shareholder of such failure and thereafter shall have the exclusive right to control the conduct of such proceedings.

   (b)    Tax Returns and Cooperation. At the Company's sole cost and expense, the Company shall have prepared and filed on a timely basis all Tax Returns of the Company relating solely to periods on or before the date hereof. In preparing the 1999 federal and state income tax returns of the Company for the period ending December 31, 1999, the Company shall make the election under Section 1362(e)(3) of the Code, and the Shareholder and the Purchaser agree to consent to such election. At the Company's sole cost and expense, Purchaser shall prepare and file (or cause Company to prepare and file) on a timely basis all Tax Returns of the Company relating solely to periods after the date hereof. Purchaser shall use Arthur Andersen LLP to prepare such Returns. Shareholder shall cooperate with Purchaser and the Company in the preparation and timely filing of all such Returns.

   4.5    Value of Company Assets. As of the close of business on the date of the Closing, the net realizable asset value of the Company is $425,755. In the event the net realizable asset value of the Company as of the close of business on the date of the Closing is less than the net realizable asset value of the Company as of the close of business on December 23, 1999, Shareholder agrees to pay and indemnify the Company against the amount by which such net realizable asset value of the Company as of the close of business on the date of the Closing is less than the net realizable asset value of the Company as of December 23, 1999 (the "Short Fall"). In the event that the net realizable asset value of the Company as of the close of business on the date of the Closing is greater than the net realizable asset value of the Company as of the close of business on December 23, 1999, the Company agrees to, and the Purchaser agrees to cause the Company to, pay Shareholder the amount by which such net realizable asset value of the Company as of the close of business on the date of the Closing exceeds the net realizable asset value of the Company as of the close of business on December 23, 1999 (the "Excess"). The determination of the net realizable asset value of the Company as of the close of business on the date of the Closing shall be made by Arthur Andersen, LLP, who shall promptly upon such determination notify the Purchaser and the Shareholder of any Short Fall or Excess. The Shareholder shall pay to the Purchaser the amount of any Short Fall within three (3) business days after receipt by the Shareholder of notice of such Short Fall. The Purchaser shall pay to the Shareholder the amount

\\A01\\VOL1\\CRPDATA\\USERS\\AEH\\WORD\\TRANSTAR\\LSI-SPA3.DOC

GAINO 003280

of any Excess within three (3) business days after receipt by the Purchaser of notice of such Excess.

4.6    Termination of Employee Plans.

(a)    Prior to the date hereof, the Company and Shareholder have taken all steps reasonably necessary to terminate the Company Benefit Plans, including, but not limited to, providing any required notices, adopting any required amendments or resolutions to be effective as of the date hereof, and fulfilling all of their obligations to contribute to and administer such Company Benefit Plans in accordance with their terms.    Within a reasonable period of time following the date hereof and prior to distributing any Assets from an ERISA Plan that is an "employee pension benefit plan" as defined in Section 3(2) of ERISA that is intended to be qualified under Code Section 401(a) and that is terminated pursuant to this paragraph, the Shareholder will use his best efforts to (i) bring the ERISA Plan into compliance as to form with all applicable Laws, (ii) obtain a favorable determination letter from the Internal Revenue Service, and (iii) take all curative action necessary to ensure that the ERISA Plan's qualified status is preserved until liquidation of the plan's Assets.    Nothing in this Section 4.6(a) shall obligate the Purchaser to contribute to any Company Benefit Plan, including any ERISA Plan, or otherwise assume any obligations with respect thereto.

(b)    The Shareholder shall be liable under the Company Benefit Plans for all claims due and unpaid after the date hereof, for all claims incurred before or after the date hereof (whether or not paid or presented before the date hereof), for all Liabilities arising from any failure before or after the date hereof to comply with the requirements of ERISA, the Code or regulations thereunder and for all other Liabilities whatsoever arising at any time out of the Benefit Plans or their administration or termination and agrees to indemnify, defend and hold harmless the Purchaser and Company from and against any Losses (as defined in Section 7.1 hereof), suffered or incurred by the Purchaser or Company, as and when incurred, by reason of, in connection with or arising out of any Benefit Plan adopted, maintained, sponsored in whole or in part, or contributed to by the Company or an Affiliate of the Company at any time prior to the date hereof.

(c)    If required by applicable Law or Contract, the Purchaser will provide COBRA coverage for the periods and to the extent required by applicable Law for employees of the Company, former employees and their eligible dependents.    The Shareholder agrees to reimburse the Purchaser within ten (10) days of receipt of written notice to the Shareholder for any and all expenses incurred by the Purchaser for the premiums and costs associated with providing such COBRA coverage for such qualified beneficiaries, regardless of when such claims are presented.

4.7    Company Name.  Company shall, and Purchaser shall cause Company to, change the name of Company within thirty (30) days following the date of Closing and shall execute and deliver to Shareholder any documents necessary and appropriate to transfer its interests in the name "Lucor Special Investments, Inc." to Shareholder.

**ARTICLE V**
**ACTIONS TAKEN ON EXECUTION BY SHAREHOLDER**

Upon execution of this Agreement, the Shareholder shall deliver the following documents to the Purchaser:

\\AO1\VOL1\CRPDATA\USERS\AEH\WORD\TRANSTAR\LSI-SPA3.DOC

GAIN0 003281

5.1    The Shares.    Stock certificates representing all of the Shares, together with accompanying stock transfer powers or instruments of assignment, duly endorsed in blank for the transfer thereof.

5.2    Releases.    A release from the Shareholder in substantially the form of Exhibit 5.2 attached hereto.

5.3    Resignations.    A resignation from each of the officers and directors of the Company in substantially the form of Exhibit 5.3 attached hereto.

5.4    Legal Opinion.    A legal opinion addressed to the Purchaser from King & Spalding, legal counsel to the Shareholder and the Company, in substantially the form of Exhibit 5.4 attached hereto.

5.5    Consents.    The written consent or approval of all third parties (including Regulatory Authorities) necessary or appropriate for consummation of the transactions contemplated herein, each of which is in form and substance satisfactory to the Purchaser.

5.6    FIRPTA Certificate.    A certificate or certificates in the form sufficient to permit Purchaser to rely on such certificate or certificates without incurring any Liability therefrom in not withholding any portion of the Purchaser Price under Section 1445 of the Code.

5.7    Guaranty.    An unconditional guaranty in form and content acceptable to Purchaser, executed by Mark Gainor to guarantee the obligations of the Company and Shareholder hereunder.

## ARTICLE VI
## ACTIONS TAKEN ON EXECUTION BY THE PURCHASER

6.1    Upon execution of this Agreement, the Purchaser shall deliver the Purchase Price to the Shareholder as provided in Section 1.2 hereof.

## ARTICLE VII
## INDEMNIFICATION

7.1    Indemnification of Purchaser.    Subject to the terms and conditions in this Article VII, the Shareholder shall indemnify, defend and hold harmless the Purchaser and upon consummation of the transactions contemplated hereby, the Company, and the directors, officers, agents, employees and Affiliates of each (the "Purchaser Indemnitees") from and against any loss, damage, Liability, cost and expense, including, subject to Section 8.13, attorneys' fees (collectively "Losses"), suffered or incurred by any Purchaser Indemnitee, as and when incurred, by reason of, in connection with or arising out of (i) any breach of any representation or warranty of Shareholder in this Agreement, (ii) any failure, breach or non-fulfillment of any covenant or agreement of Shareholder herein or in the release delivered by the Shareholder pursuant to Section 5.2 hereof, (iii) any Litigation or potential Litigation listed on Schedule 2.7, (iv) any Liability listed on Schedule 2.8 or as otherwise agreed to by the parties in writing, (v) any Liability relating to Taxes

- 11 -

GAINO 003282

of the Company for periods prior to the Closing or (vi) any Liability of the Company existing on or prior to Closing and not reflected in the Financial Statements.

7.2    Indemnification of Shareholder. Subject to the terms and conditions in this Article VII, the Purchaser shall indemnify, defend and hold harmless Shareholder from and against any Loss suffered or incurred by Shareholder, as and when incurred, by reason of, or arising out of, any (i) breach of any representation or warranty by Purchaser in this Agreement, or (ii) any failure or nonfulfillment of any covenant or agreement of Purchaser herein.

7.3    Notice and Opportunity to Defend.    The party indemnified hereunder (the "Indemnified Party") shall notify in writing the indemnifying party (the "Indemnifying Party") promptly after a third party claim is presented to the Indemnified Party or a claim is reasonably discovered by the Indemnified Party and the Indemnifying Party shall defend such claim at its expense and may select the attorneys for such defense. If the Indemnifying Party does not defend such claim, the Indemnified Party may do so without the Indemnifying Party's participation, in which case the Indemnifying Party shall pay all the expenses of such defense. The Indemnifying Party may not settle or compromise such claim unless (i) a condition to such settlement or compromise is the unconditional release of all claims asserted against the Company or Indemnified Party or (ii) the Indemnified Party shall have given its consent, which consent shall not be unreasonably withheld. If the Indemnified Party fails to notify the Indemnifying Party of a third party claim as provided in this Section 7.3, and if the Indemnifying Party is thereby materially prejudiced by such failure of notice in its defense of the claim, the Indemnifying Party's obligation of indemnity hereunder shall be extinguished with respect to such claim only to the extent that the Indemnifying Party has been prejudiced by the failure to timely give such notice. The Indemnified Party and Indemnifying Party agree to cooperate in good faith in the defense and/or settlement of any such claim. For purposes of this Agreement, Shareholder shall be deemed to have assumed control of the conduct and proceedings of all disputes and other matters disclosed in Schedules 2.7 and 2.18.

7.4    Survival of Representations and Warranties; Rights Not Affected by Knowledge. The representations, warranties, covenants and agreements of Shareholder and Purchaser will survive the date hereof for two (2) years, except the representations and warranties contained in Sections 2.1, 2.2, 2.3, 2.4, 2.20 and 3.1, which shall not be limited as to time, and the representations and warranties contained in Section 2.18, which shall be limited to the applicable period of the statute of limitation. None of the rights to indemnification or other remedies based upon the representations, warranties, covenants and agreements in this Agreement shall affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

7.5    Subrogation. Upon payment in full of any claim by a third party under this Article VII (irrespective of the method of payment), the Indemnifying Party shall be subrogated to the extent of such payment to the rights of the Indemnified Party against any Person with respect to the subject matter of such claim.

7.6    Guaranty of Mark J. Gainor. To the extent Purchaser shall have any claim for indemnification pursuant to this Article VII, it shall be permitted to submit such claim directly to

- 12 -

GAINO 003283

Mark J. Gainor pursuant to the terms of the guaranty delivered to Purchaser in accordance with Section 5.7 in the event Shareholder is unable to satisfy such obligation in a timely manner.

7.7    Limitation of Indemnification. Notwithstanding anything to the contrary set forth in this Article VII, and except with respect to any indemnity for any Liability covered by clause (iii) or clause (v) of Section 7.1, which shall not be subject to the limitation set forth herein, the Shareholder shall not be required to indemnify Purchaser (i) unless in any single instance the amount for which indemnity is due exceeds $1,000 or (ii) until the aggregate of all amounts for which indemnity is due exceeds $5,000 (regardless of whether the individual amounts for which indemnity would otherwise be due exceed $1,000). In the event claims totaling more than $5,000 are presented by Purchaser in accordance herewith, Shareholder shall indemnify Purchaser for all amounts in excess of $5,000.

7.8    Limitation as Exclusive Remedy. The indemnification provided in this Article VII, including the guaranty of Mark J. Gainor provided in Section 7.6 hereof, shall be the exclusive post-closing remedy available to the Purchaser for any breach by the Shareholder of any representations or warranties, or any failure, breach or non-fulfillment of any covenant or agreement of Shareholder set forth in this Agreement, except for breaches arising out of or relating to fraud or willful misrepresentation by the Shareholder; provided, however, that the limitation set forth herein shall not impair or affect the rights of Purchaser to seek non-monetary equitable relief, including without limitation, specific performance or injunctive relief, to redress any default or breach of this Agreement.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

8.1    Definitions. The capitalized terms set forth below shall have the following meanings:

"*Affiliate*" of a Person shall mean any other Person directly or indirectly controlling, controlled by or under common control with such Person. The term "control" in this definition shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the relevant Person through ownership of voting securities, by Contract or otherwise.

"*Assets*" shall mean all of the assets, properties, businesses and rights of a Person of every kind, nature, character and description, whether real, personal or mixed, tangible or intangible, accrued or contingent, whether or not carried on the books and records of such Person, and whether or not owned in the name of such Person and wherever located.

"*COBRA*" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"*Contract*" shall mean any written or oral agreement, arrangement, authorization, commitment, contract, indenture, instrument, lease, obligation, plan, practice, restriction,

GAINO 003284

understanding, or undertaking of any kind or character, or other document to which a Person is a party or that is binding on such Person or its Equity Rights, Assets or business.

"*Default*" shall mean (i) any breach or violation of, default under, contravention of, or conflict with, any Contract, Law, Order, or Permit, (ii) any occurrence of any event that with the passage of time or the giving of notice or both would constitute a breach or violation of, default under, contravention of, or conflict with, any Contract, Law, Order, or Permit, or (iii) any occurrence of any event that with or without the passage of time or the giving of notice would give rise to a right of any Person to exercise any remedy or obtain any relief under, terminate or revoke, suspend, cancel, or modify or change the current terms of, or renegotiate, accelerate the maturity or performance of, or increase or impose any Liability under, any Contract, Law, Order, or Permit.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"*Equity Rights*" shall mean all equity interests in a Person (including but not limited to shares of capital stock, partnership units or interests or limited liability company interests or units) ("Equity Interests"), and all arrangements, calls, commitments, Contracts, options, rights to subscribe to, scrip, understandings, warrants, or other binding obligations of any character whatsoever relating to, or securities or rights convertible into or exchangeable for, Equity Interests of a Person or by which a Person is or may be bound to issue additional Equity Interests or other Equity Rights.

"*GAAP*" shall mean generally accepted United States accounting principles then in effect, applied on a consistent basis.

"*Intellectual Property*" shall mean copyrights, patents, trademarks, service marks, service names, trade names, technology rights and licenses, computer software (including any source or object codes therefor or documentation relating thereto), trade secrets, franchises, know-how, inventions and other intellectual property rights, and any application with any Regulatory Authority for any of the foregoing.

"*Knowledge*" with respect to Shareholder (including references to such Shareholder being aware of a particular matter) shall mean those facts that are known by Shareholder after due inquiry of all employees of the Company.

"*Law*" shall mean any federal, state, local, foreign or other code, law (including common law), ordinance, regulation, reporting or licensing requirement, rule, or statute, including those promulgated, interpreted or enforced by any Regulatory Authority.

"*Liability*" shall mean any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), claim, deficiency, guaranty or endorsement of or by any Person (other than endorsements of notes, bills, checks, and drafts presented for collection or deposit in the ordinary course of business) of any type, whether accrued, absolute or contingent, liquidated or unliquidated, matured or unmatured, or otherwise.

.AOI\VOL1\CRPDATA\USERS\AEH\WORD\TRANSTAR\LSI-SPA3.DOC

GAIN0 003285

"*Lien*" shall mean any conditional sale agreement, default of title, easement, encroachment, encumbrance, hypothecation, infringement, lien, mortgage, pledge, reservation, restriction, security interest, title retention or other security arrangement, or any adverse right or interest, charge, or claim of any nature whatsoever, other than liens for current property Taxes not yet due and payable.

"*Litigation*" shall mean any action, arbitration, cause of action, claim, complaint, criminal prosecution, governmental or other examination or investigation, hearing, administrative or other proceeding.

"*Order*" shall mean any administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling, or writ of any federal, state, local, foreign or other court, arbitrator, mediator, tribunal, administrative agency, or Regulatory Authority.

"*Permit*" shall mean any federal, state, local, or foreign governmental approval, authorization, certificate, easement, franchise, license, notice, permit, or right to which any Person is a party or that is or may be binding upon or inure to the benefit of any Person or its Equity Rights, Assets, or business.

"*Person*" shall mean a natural person or any legal, commercial or governmental entity, such as, but not limited to, a corporation, general partnership, joint venture, limited partnership, limited liability company, trust, business association, group acting in concert, or any person acting in a representative capacity.

"*Regulatory Authorities*" shall mean, collectively, all foreign, federal, state, county, local or other governmental or regulatory agencies, authorities (including self-regulatory authorities), instrumentalities, commissions, boards or bodies having jurisdiction over any of the parties hereto, and/or their respective businesses or Assets.

"*Securities Act*" shall mean the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

"*Tax Return*" shall mean any report, return, information return, or other information required to be supplied to a taxing authority in connection with Taxes, including any return of an affiliated or combined or unitary group that includes a party or its subsidiaries.

"*Tax*" or "*Taxes*" shall mean any federal, state, county, local, or foreign taxes, charges, fees, levies, imposts, duties, or other assessments, including income, gross receipts, excise, employment, sales, use, realty, transfer, license, payroll, franchise, severance, stamp, occupation, windfall profits, intangibles, environmental, federal highway use, commercial rent, customs duties, capital stock, paid-up capital, profits, withholding, Social Security, single business and unemployment, disability, real property, personal property, registration, ad valorem, value added, alternative or add-on minimum, estimated, or other tax or governmental fee of any kind whatsoever, imposed or required to be withheld by the United States or any state, county, local or foreign government or subdivision or agency thereof, including any interest, penalties, and additions imposed thereon or with respect thereto.

8.2     Notices.

\\AO1\VOL1\CRPDATA\USERS\AEH\WORD\TRANSTAR\LSI-SPA3.DOC

GAINO 003286



(a)    All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been given if delivered by (i) hand delivery, (ii) United States registered or certified mail, return receipt requested, first class postage prepaid, or (iii) Federal Express or similar overnight courier service, to the parties or their assignees, addressed as follows:

| If to the Shareholder or the Company: | With a copy to: |
|---|---|
| MJG Partners, L.P.<br>2205 Highway 42 North<br>McDonough, Georgia 30253<br>Attn: Mark J. Gainor<br>Fax: (770) 472-1444 | King & Spalding<br>191 Peachtree Street, NE<br>Suite 4000<br>Atlanta, Georgia 30303<br>Attn: Hector Llorens, Esq.<br>Fax: (404) 572-3523 |
| If to the Purchaser: | With a copy to: |
| LSI Holdings, LLC<br>Atlanta Financial Center<br>3333 Peachtree Road, N.E., Suite 450<br>Atlanta, Georgia 30326<br>Attn: Mark C. Klopfenstein<br>Fax: (404) 760-2610 | Sutherland Asbill & Brennan LLP<br>999 Peachtree St., N.E.<br>Atlanta, Georgia 30309<br>Attn: Mark D. Wasserman, Esq.<br>Fax: (404) 853-8806 |

(b)    If delivered personally, the date on which a notice, request, demand or other document is delivered shall be the date on which such delivery is made and, if delivered by mail, Federal Express or other overnight courier, the date on which such notice, request, demand or other document is received shall be the date of receipt.

(c)    Any party hereto may change its address for notices herein by designating a new address in a notice delivered in accordance with this Section 8.2.

8.3    Expenses.    Except as otherwise agreed in writing by the parties and subject to Section 4.3 hereof, the Shareholder shall pay all legal and other costs and expenses incurred by the Shareholder or the Company in connection with the preparation, negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby. The Purchaser shall pay all legal and other costs and expenses incurred by it in connection herewith.

8.4    Waiver.    Any failure on the part of any party to comply with any of its obligations, agreements or conditions hereunder may be waived by any other party to whom such compliance is owed, provided such waiver is in writing. No waiver of any provision of this Agreement or of a breach of any provision shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.

8.5    Assignment.    This Agreement shall not be assignable, in whole or in part, by any party hereto without the prior written consent of each other party; provided, however, that Purchaser may assign its rights hereunder to any Affiliate without the consent of Shareholder.



- 16 -

\\AO1\VOL1\CRPDATA\USERS\AEH\WORD\TRANSTAR\LSI-SPA3.DOC

GAINO 003287

8.6    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, executors, administrators, successors and permitted assigns.

8.7    Governing Law; Severability; Remedies. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia. The provisions of this Agreement are severable and the invalidity, illegality or unenforceability of one or more of the provisions herein shall not have any effect upon the validity, legality or enforceability of any other provision to the extent consistent with the intentions of the parties. No remedy conferred by the provisions of this Agreement is intended to be exclusive of any other remedy provided herein or available at law or in equity.

8.8    Counterparts. This Agreement may be executed in two or more counterparts (including facsimile counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.9    Brokers. The Shareholder and Purchaser each represent to the other that no broker or finder has been employed in connection with the transactions contemplated hereby and each party ("Incurring Party") shall indemnify the other against fees incurred by the Incurring Party.

8.10    Schedules and Exhibits. All Schedules and Exhibits attached to this Agreement are incorporated herein by reference and made a part hereof.

8.11    Headings. The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

8.12    Entire Agreement. This Agreement, and the Exhibits, Schedules, certificates and other documents delivered pursuant hereto or incorporated herein by reference, contain and constitute the entire agreement among the parties and supersede and cancel any prior agreements, representations, warranties, or communications, whether oral or written, among the parties relating to the transactions contemplated by this Agreement. Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of such change, waiver, discharge or termination is sought.

\\AD1\VOL1\CRPDATA\USERS\AEH\WORD\TRANSTAR\LSI-SPA3.DOC

GAINO 003268

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first written above.

SHAREHOLDER:

MJG Partners, L.P.

By:_____
     MJG Ventures, LLC,
     its General Partner

By:_____
     Mark J. Gainor
     Member

By:_____
     Elyse S. Gainor
     Member

PURCHASER:

LSI Holdings, LLC

By:_____
     Mark C. Klopfenstein
     President

\\MON\VOL1\CRP.DATA\USERS\AE\WORD\TRANSTAR\LSI-SPA3.DOC

GAINO 003289

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first written above.

SHAREHOLDER:

MJG Partners, L.P.

By:    MJG Ventures, LLC,
       its General Partner

    By: _____
       Mark J. Gainor
       Member

    By: _____
       Elyse S. Gainor
       Member

PURCHASER:

LSI Holdings, LLC

By: _____
    Mark C. Klopfenstein
    President

C:\TEMP\LSI-SPA.DOC

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first written above.

SHAREHOLDER:

MJG Partners, L.P.

By:_____
      MJG Ventures, LLC,
      its General Partner

By:_____
      Mark J. Gainor
      Member

By:_____
      Elyse S. Gainor
      Member

PURCHASER:

LSI Holdings, LLC

By:_____
      Mark C. Klopfenstein
      President

H:\AEH\WORD\TRANSTAR\LSI-SPA.DOC

GAINO 003291