**EXHIBIT "A"**

1. In April of 1999, Plaintiffs purchased a home in Florida.

2. No later than October 6, 1999, which was before any of the transactions involved in the strategy were implemented, Andersen learned of Plaintiffs' intent to change their residency from Georgia to Florida.

3. Andersen then advised Plaintiffs that they should delay becoming Florida residents until January of 2000, in order to avoid the risk of being taxed in both states (Georgia state income tax and Florida intangibles tax). Thus Andersen knew in 1999 that Plaintiffs would be Florida residents by the time (indeed months before) implementation of the strategy was completed by filing Plaintiffs' 1999 tax returns in April of 2000.

4. In January of 2000, the date recommended by Andersen, Plaintiffs became Florida residents.

5. In February of 2000, after Plaintiffs moved to Florida, Andersen sent Gainor a letter at Gainor's Florida address confirming that Andersen would prepare and provide plaintiffs's tax returns for the year 1999.

6. After Plaintiffs moved to Florida, Andersen prepared the 1999 tax returns that claimed the deductions for the losses purportedly created by implementation of the strategy.

7. On April 17, 2000, Andersen sent the tax returns to Plaintiffs in Florida. The tax return reflected Plaintiffs' Florida home address.

8. Andersen advised Gainor, while Gainor was in Florida and a Florida resident, that Arthur Andersen had relied on the Brown & Wood opinion letters in preparing the 1999 tax returns.

9. It was only after moving to Florida and being advised in Florida by Brown & Wood of their opinions and being sent in Florida the Arthur Andersen tax returns prepared in reliance on the Brown & Wood opinions, that Gainor proceeded, in reliance on that advice, to file the 1999 tax returns as prepared by Andersen.

10. After the filing of the 1999 tax returns, Arthur Andersen continued to work with Gainor's Florida accountants and to communicate with them in Florida regarding Plaintiffs' tax and accounting matters.

11. Gainor continued to work with Arthur Andersen from Florida on matters relating to the Brown & Wood opinion letters as late as the summer of 2000.

12. Andersen personnel traveled to Florida on a number of occasions to meet with Gainor.

13. In February of 2002, Gainor participated in a telephone conference with Mr. Marx and Wes Scheibel of Arthur Andersen and other professionals in a continuing effort to deal with tax issues arising from the 1999 tax returns and the Brown & Wood opinion letters.

14. Andersen continued through at least March of 2002 (over two years after Gainor became a Florida resident) to coordinate with Gainor's other tax professionals on numerous occasions on matters relating to The Sidley Plan.

15. On or about January 9, 2003, Andersen's New York legal counsel wrote to Gainor at Gainor's Florida address advising Gainor that Andersen's records had been subpoenaed by the IRS and asking Gainor to advise them if Gainor would be asserting a claim of privilege and, if Gainor wished to review their files, to notify them at locations in Illinois.

16. The IRS audited Gainor when he was a Florida resident and disallowed the tax shelter loss while he was a Florida resident.

17. Andersen refused to assist Gainor with the IRS audit when Gainor was in Florida.

18. Virtually all of the fees and expenses of participating in the IRS settlement initiative and dealing with the IRS after the filing of the 1999 tax returns arising out of the Sidley plan were incurred by Gainor as a Florida resident.

19. In January of 2006, when Gainor settled with the IRS and wrote the check to the IRS for $17,000,000, Gainor was a Florida resident at the time.

20. Before any of the transactions involved in the strategy were implemented, Andersen knew that the Plaintiffs would be moving to Florida and that Plaintiffs would be Florida residents before implementation of the strategy was completed.

21. It was not until after Plaintiffs moved to Florida that Andersen prepared the 1999 tax returns that claimed the deductions purportedly created by the strategy that the IRS ultimately disallowed; Andersen placed Plaintiffs' Florida address on these tax returns; and Andersen sent these tax returns to Plaintiffs at Plaintiffs' residence in Florida.

22. Plaintiffs were Florida residents when they were audited by the IRS; Plaintiffs were Florida residents when they incurred the fees and expenses of dealing with the IRS; and Plaintiffs were Florida residents when they suffered damage in the form of having to pay the IRS $17,000,000.