# EXHIBIT 14

## TO DECLARATION OF RICHARD CANDELORA

Dockets.Justia.com

get clips?

MR. WILKES: No.

I'll hand you your copy.

THE WITNESS: I was going to say, they're probably in the drawer there.

MR. WILKES: Oh.

You're all right?

Q. Let me show you what's been marked as Exhibit 2, and it is a document which has been Bates stamped -- it has two Bates stamps on it, but one is M 327031 through M 327069.

And let me ask you --

A. Let me -- 069, yes.

Q. Have you ever seen Exhibit 2 before?

A. Yes, I believe this was one of the documents that was produced to you in this action.

Q. To what does the M refer?

A. I'm sorry?

Q. The M, the Bates stamp M.

A. I would have to ask my counsel.

THE WITNESS: I don't know what

understanding what the Plaintiff was alleging.

Q. Is Exhibit 2 to your deposition the redacted opinion letter that Mr. Ruble furnished to Mr. Gainor's accountants, is that a plan?

THE WITNESS: This gets to be -- what do I...

MR. ALTMAN: I think you can answer. If you understand the question, you can answer it.

A. This probably is semantics in terms of what's a plan in a capitalized plans concept.

This seemed to me to be a simple e-mail saying here's a version of an opinion for a particular type of transaction related to these sections. It didn't seem to be saying here's a term sheet for transactions or here's this or that or I've developed a transaction for you. I didn't sense that kind of relationship from that e-mail.

Q. Do you know if this August 5, 1999 e-mail from Mr. Ruble to Mr. Gainor's

accountant was used by them to structure the transactions that are referred to in the complaint as the Sidley plan?

A. No, I do not know the linkage.

I know that there was this in August, I know there was a draft opinion that Mr. Ruble sent to Arthur Andersen in March which would have been -- let's call it seven or eight months later that has real similarities to the approach here.

But in terms of what happened in between, I could not tell that from our records.

Q. Do you have any reason to deny that the transactions described in Mr. Ruble's letter of -- contained in Exhibit 2 dated August 5, 1999 were -- was the first step in terms of Arthur Andersen's presentation of a plan to Mr. Gainor?

A. How did you frame that question?

Do I have a reason to deny or do I agree?

Q. Do you have any reason not to believe that this Exhibit 2 was not the basis

something here, we can probably...

MR. ALTMAN: I think I can do that if you can have it e-mailed to me.

MR. WILKES: Okay. We'll see if this miracle of technology will work.

We have other things to ask in the meantime, so we don't need to break.

Q. Let me show you what we'd like to have marked as Exhibit 5 to your deposition and ask if you can identify this for us, please.

(Whereupon, New matter memorandum was marked Exhibit 5 for identification.)

A. This is the new matter memorandum that I referred to earlier today that I believe had been produced that we had had in our files.

Q. Now, is there a matter number assigned to this memorandum?

A. Not at this point.

I'm sorry, it looks like the client number is 87250 up at the top. As I recall -- this is a form we don't use now --

J. A. MACKINNON

A. As far as I could ascertain, he was the only lawyer, yes.

Q. Was there a file number for this matter for Mr. Gainor?

A. There was a general account that was opened I believe in late July 1999 by Mr. Ruble. I believe the new matter memo form was produced to you. It lists Mr. Ruble as the only lawyer. The account was opened under the name of Arthur Andersen. There do not appear to have been subaccounts or any account that was open in particular for Mr. Gainor.

Q. Was Mr. Gainor a client of your firm?

A. I did not see any engagement letter or other documents during the course of my review that would indicate that he was a client, other than we did, I understand, issue an opinion to Mr. Gainor dated December 31, 1999.

Now, I will say I did not see a signed copy of that opinion. There were multiple drafts that I believe were produced to you. Mr. Gainor was one of the addressees

on at least one of the opinions. So, on the basis of that, if the opinion were delivered, then I would think Mr. Gainor would have been a client.

Q. Was Arthur Andersen a client of the firm's?

MR. ALTMAN: Vague as to time.

A. Yeah, it would be -- what's the time period, please?

Q. In 1999.

A. In 1999, I could not find any evidence that they were a client.

Q. On this new matter sheet, isn't Arthur Andersen identified as the client?

A. They are listed at the top as the client the way the form has been completed.

Q. And that would be a true statement?

Were they a client?

A. I did not find any evidence that we gave advice to Arthur Andersen on this or other matters during this time period. My suspicion, and this is really -- is that Mr. Ruble opened this as a matter of convenience

J. A. MACKINNON

section in terms of what it says or what it said in 1999.

As I indicated yesterday, I think we do -- I do believe that Mr. Gainor was a client, but I'm not sure what would have been in this attorney-client section.

Q. Page 24-1 deals with maintenance of diaries.

Did that apply to the activities of Mr. Ruble in connection with his work on the opinion letters issued to Mr. Gainor?

MR. ALTMAN: Beyond the scope.

A. Again, I did not review that for purposes of this deposition.

Q. So, you don't know?

A. I don't know.

Q. And diary narratives at Page 25, did that pertain to the work that was done by Mr. Ruble and other lawyers at Sidley, Austin in connection with the opinion letters issued to Mr. Gainor?

A. I don't know for the same reason I indicated on the other sections.

MR. WILKES: I could keep going,